973 P.2d 1246 (1999)
Leila Jeanne HILL; Audrey Himmelmann; and Everitt W. Simpson, Jr., Petitioners,
v.
David J. THOMAS, in his official capacity as District Attorney for the First Judicial District of the State of Colorado; City of Lakewood, Colorado; Ken Salazar, in his official capacity as Attorney General of the State of Colorado; and the State of Colorado, Bill Owens, Governor, Respondents.
No. 97SC630.
Supreme Court of Colorado, En Banc.
February 16, 1999.
*1247 Roger W. Westlund, Thornton, Colorado, The American Center for Law & Justice Jay Alan Sekulow, Lawrenceville, Georgia, James Matthew Henderson, Sr., Washington, D.C., Attorneys for Petitioners.
No appearance on behalf of David J. Thomas, District Attorney for the First Judicial District of the State of Colorado.
Ken Salazar, Attorney General, Barbara McDonnell, Chief Deputy Attorney General, Michael E. McLachlan, Solicitor General, Patricia S. Bangert, Director of Legal Policy, Carol D. Angel, Senior Assistant Attorney General, Natural Resources Section, Denver, Colorado, Attorneys for Ken Salazar and State of Colorado.
Gorsuch Kirgis L.L.C., Roger W. Noonan, Maureen Herr Juran, Denver, Colorado, Attorneys for City of Lakewood
Planned Parenthood of the Rocky Mountains, Inc., Kevin C. Paul, Denver, Colorado, Attorneys for Amici Curiae Planned Parenthood of the Rocky Mountains, Inc., and the Center for Reproductive Law & Policy, Inc.
City Attorney, Joseph N. de Raismes, Boulder, Colorado, Attorney for Amicus Curiae, City of Boulder
Justice SCOTT delivered the Opinion of the Court.
In this case we must decide whether a legislative enactment designed to protect the privacy rights of citizens entering and leaving *1248 Colorado health care facilities unduly burdens the First Amendment rights of other citizens. We conclude that it does not.
We granted certiorari in Hill v. City of Lakewood, 949 P.2d 107 (Colo.App.1997), to determine whether a Colorado statutory provision, in particular, section 18-9-122(3), 6 C.R.S. (1998), can withstand scrutiny under a facial First Amendment challenge. Section 18-9-122(3) provides "[n]o person shall knowingly approach another person within eight feet of such person, unless such other person consents, for the purpose of ... counseling with such other person in the public way or sidewalk area within a radius of one hundred feet from any entrance door to a health care facility." In light of the order of remand by the United States Supreme Court to the Colorado Court of Appeals, our review is necessarily informed by the Supreme Court's opinion in Schenck v. Pro-Choice Network, 519 U.S. 357, 117 S.Ct. 855, 137 L.Ed.2d 1 (1997).[1] Nonetheless, we rely upon the standard announced in Ward v. Rock Against Racism, 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). In doing so, while recognizing that the statute creates a limited floating buffer zone, we hold that, on its face, the statute does no more than place reasonable restrictions on speech that (1) are content-neutral; (2) are narrowly tailored to serve a significant government interest; and, (3) leave open ample alternative means for the communication of information petitioners seek to place into the marketplace of ideas. We so conclude because the standard announced in Ward permits greater deference for legislative enactments regulating speech than does the Schenck standard, which places greater limitations upon the judicial regulation of speech through injunctive proceedings. We therefore uphold the statute against petitioners' facial attack and affirm the judgment of the court of appeals.

I.
Petitioners, Leila Jeanne Hill, Audrey Himmelmann, and Everitt W. Simpson, Jr. (petitioners) filed a declaratory judgment action and requested injunctive relief in Jefferson County District Court (trial court) under a facial challenge[2] to section 18-9-122(3), alleging that it violated the First Amendment and was therefore unconstitutional. Respondents, David J. Thomas, in his official capacity as District Attorney for the First Judicial District of the State of Colorado, the City of Lakewood, and other officials of the State of Colorado,[3] (collectively, the State) filed a motion for summary judgment, asserting that section 18-9-122(3) was lawful as a constitutional time, place, and manner regulation of speech under the First Amendment to the United States Constitution. Petitioners filed a cross-motion for summary judgment alleging that section 18-9-122(3) was (1) facially unconstitutional as a prior restraint; (2) a content-based restriction lacking justification; and (3) unconstitutionally overbroad and vague.
In granting the State's motion for summary judgment, the trial court applied the standard set forth by the United States Supreme Court in Ward v. Rock Against Racism, 491 U.S. 781, 109 S.Ct. 2746, 105 *1249 L.Ed.2d 661 (1989). Applying that standard, the trial court found that section 18-9-122(3) was content-neutral, was narrowly tailored to serve a significant governmental interest, and left open ample alternative means of communication.
Petitioners appealed to the court of appeals, and the court of appeals affirmed the trial court's ruling. See Hill v. City of Lakewood, 911 P.2d 670 (Colo.App.1995) (Hill I). They then sought review in this court, which we denied. After the United States Supreme Court announced its decision in Schenck v. Pro-Choice Network, 519 U.S. 357, 117 S.Ct. 855, 137 L.Ed.2d 1 (1997), petitioners obtained review by petition to our nation's high court. Without an opinion, however, the United States Supreme Court vacated the judgment of the court of appeals in Hill I, and remanded the case to the court of appeals for reconsideration in light of Schenck. See Hill v. Colorado, 519 U.S. 1145, 117 S.Ct. 1077, 137 L.Ed.2d 213 (1997).
On remand, the court of appeals determined that the test announced in Schenck was not applicable, and applied the standard announced by the Supreme Court in Ward. "Applying the Ward rationale here, we conclude that the statute meets constitutional muster." Hill v. City of Lakewood, 949 P.2d 107, 109-10 (Colo.App.1997) (Hill II). Thus, the court of appeals once again held that section 18-9-122(3) did not violate petitioners' First Amendment rights. See id. at 110.
We granted certiorari to review the important First Amendment issues raised by the judgment of the court of appeals. We now affirm that judgment.

II.
Shortly before 1993, many citizens seeking medical counseling and treatment at Colorado health care facilities were openly subjected to verbal abuse and on occasion, were physically assaulted while entering or leaving health care facilities. Confronted by these threats to public safety and open, hostile, and sometimes violent confrontations in public places, the Colorado General Assembly held public hearings to determine the nature and extent of the danger posed by such acts to public safety. As a consequence of the testimony of several witnesses that revealed widespread, violent confrontations, the General Assembly developed a statute intended to acknowledge a citizen's "right to protest" or counsel against certain medical procedures while also assuring that government protects a "person's right to obtain medical counseling and treatment." § 18-9-122(1), 6 C.R.S. (1998).

A.
In 1993, the General Assembly enacted section 18-9-122, entitled "Preventing passage to and from a health care facility engaging in prohibited activities near facility" as part of Colorado's criminal code.[4]
*1250 In subsection 18-9-122(1), the General Assembly set forth the public health considerations of "access to health care facilities," which it characterized as "imperative" for Colorado's citizens. "Balanc[ing]" the right to protest or counsel against certain medical procedures with another person's right to obtain medical counseling and treatment, the Colorado legislature sought to prohibit anyone from "knowingly obstructing another person's entry to or exit from a health care facility." § 18-9-122(1). Subsection 18-9-122(2) expressly classifies conduct by which a person "knowingly obstructs, detains, hinders, impedes or blocks another person's entry to or exit from a health care facility" as a "class 3 misdemeanor."[5] § 18-9 122(2).
Subsection 18-9-122(3), which is at issue here, creates a 100-foot radius zone around a health care facility, as a "fixed buffer zone." Within that fixed buffer zone only, no person may knowingly approach another within eight feet for the purpose of displaying a sign, engaging in oral protest, educating, counseling, or passing leaflets or handbills, unless the other person consents to such an approach. This eight-foot radius zone we call a "limited floating buffer zone."[6]
Section 18-9-122 was enacted by the General Assembly in response to concerns regarding open access to health care counseling and treatment at Colorado health care facilities. While the legislation was pending, the Colorado House and Senate Judiciary Committees heard testimony regarding abortion opponents' conduct at abortion clinics, including physically blocking entrances, intimidation, and harassment of individuals seeking services. A nurse practitioner who works at a clinic which provides, in part, abortion counseling and services, testified that anti-abortion protestors:
yell, thrust signs in faces, and generally try to upset the patient as much as possible, which makes it much more difficult for us to provide care in a scary situation anyway ... We have had to place security doors where there is [sic] double locks. People have to be rung in. Each of the doors, we have magnetic locks that slide because we have had our locks glued shut. We have had bicycle locks placed over handles so that we have had to remove some of the handles on the doors.
Hearings on H.B. 93-1209 Before the House Judiciary Committee, 59th General Assembly, 1st Reg. Sess. (Audio Tape 93-8, Feb. 12, 1993, at 7:42 a.m.). Another witness, a volunteer who escorts patients into and out of abortion clinics because of the harassment those patients face from anti-abortion protestors, testified that as patients are entering the clinic:
the protestors are yelling and screaming. They are flashing their bloody fetus signs. They are yelling, "you are killing your baby." They are yelling at us as escorts that we are guards from Dachau [World War II Nazi concentration camp utilized to commit atrocities against people of Jewish ancestry] ... they are talking about fetuses and babies being dismembered, arms and legs torn off ... A young black woman came for services yesterday. They called her "mammy."
Id. This same witness testified that:
a mother and her daughter had not heard the instructions from the clinic [to park in the parking lot] ... They parked on the street. [While walking towards the clinic], *1251 they were immediately surrounded and yelled at and screamed at ... The young woman was in tears ... The mother looked at me and said, "I can't believe this happens in this country ... my daughter was raped."
Id.
Testimony from various witnesses was compelling. With such a legislative history, it is obvious, and petitioners do not refute, that the General Assembly's actions were motivated by its interest in preserving the health and safety of Colorado's citizens. In particular, the General Assembly enacted section 18-9-122 as a means of assuring a citizen's access to medical "counseling and treatment" at Colorado health care facilities.

B.
Petitioners are self-titled "sidewalk counselors."[7] "Sidewalk counselors" engage in efforts to educate, dissuade, inform and advise individuals about abortion and abortion alternatives. To accomplish these goals, petitioners utilize verbal communication, placards printed with anti-abortion statements and/or photographs, leaflets, and various other demonstrative devices, including plastic replicas of fetuses at various stages of development. The term "sidewalk" refers to petitioners' practice of performing these activities while standing on sidewalks and roadways outside health care facilities that provide abortion counseling, services, and procedures. Petitioners attempt to engage individuals entering the health care facility in conversation in order to dissuade those individuals from entering the facility and, presumably, obtaining abortions.
Petitioners argue that the Supreme Court's opinion in Schenck v. Pro-Choice Network, 519 U.S. 357, 117 S.Ct. 855, 137 L.Ed.2d 1 (1997), and its progeny, including Sabelko v. City of Phoenix, 120 F.3d 161 (9th Cir.1997), control. As a consequence, they argue, section 18-9-122(3) unconstitutionally restricts their First Amendment rights to protest outside of abortion clinics. In doing so, however, petitioners concede that the test for a time, place, and manner restriction is the appropriate measure of this statute's constitutionality. See Tape Recording of Oral Argument, Oct. 19, 1998, statement of James M. Henderson, Esq. Petitioners argue that pursuant to the test announced in Ward, the "floating buffer zone" created by section 18-9-122(3) is not narrowly tailored to serve a significant government interest and that section 18-9-122(3) does not provide for ample alternative channels of communication. We disagree.

III.
Before addressing petitioners' argument that their First Amendment rights have been abridged, we discuss the nature of petitioners' First Amendment rights. Then, we also review the "imperative" interest the General Assembly acted to serve, the fundamental right of privacy, access to medical counseling and treatment, against which petitioners' First Amendment rights must be balanced in this case.

A.
Repeated so often in our jurisprudence that we know it by rote, the First Amendment to the United States Constitution provides that "Congress shall make no law ... abridging the freedom of speech...." U.S. Const. amend. I.[8] *1252 It is the purpose of the First Amendment to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail, rather than to countenance monopolization of that market, whether it be by the Government itself or a private licensee.... It is the right of the public to receive suitable access to social, political, esthetic, moral, and other ideas and experiences....
Red Lion Broad. Co. v. Federal Communications Comm'n, 395 U.S. 367, 390, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). "If the marketplace of ideas is to remain free and open, governments must not be allowed to choose `which issues are worth discussing or debating....'" Consolidated Edison Co. of New York, Inc. v. Public Serv. Comm'n of New York, 447 U.S. 530, 537-538, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980) (quoting Police Dep't of Chicago v. Mosley, 408 U.S. 92, 96, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972)). It is this very fundamental right, and its full and free exercise, that requires that government permit open debate.
The First Amendment contemplates that ideas will be tested in the marketplace, and not scrutinized by government censors. With a view towards its egalitarian nature, empowering even the least powerful among us, some view "the `central meaning' of the First Amendment [as being] equality."[9] Laurence H. Tribe Constitutional Choices 188 (1985) (quoting Kenneth Karst, "Equality as a Central Principle in the First Amendment" 43 U. Chi. L.Rev. 20, 21 (1975)).
The First Amendment, in effect, limits the choices government may make in its efforts to regulate or prohibit speech. See Consolidated Edison Co. of New York, Inc., 447 U.S. at 537-38, 100 S.Ct. 2326 ("governments must not be allowed to choose which issues are worth discussing or debating").
However, the First Amendment is not an absolute prohibition and does not bar all government attempts to regulate speech. See Madsen v. Women's Health Center, Inc., 512 U.S. 753, 770, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994) (holding that an injunction establishing a thirty-six foot buffer zone around abortion clinic entrances does not violate protestor's First Amendment rights); see also People v. Baer, 973 P.2d 1225, 1232 (Colo.1999) (upholding conviction for harassment by stalking and noting that at least forty-eight states have enacted similar statutes). This is, perhaps, especially true when the questioned government action results from a particularly difficult reconciliation or "accommodation" of the right of free speech with another right fundamental in our constellation of rights. See Burson v. Freeman, 504 U.S. 191, 210, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992); Bering v. SHARE, 106 Wash.2d 212, 721 P.2d 918, 920 (1986) ("No judicial task is more difficult than balancing the constitutional rights and freedoms of citizens of this country against conflicting rights and freedoms of their fellow citizens."). It is this reconciliation or effort to accommodate the fundamental right of privacy in section 18-9-122(3) that is before us today.

B.
Here, the fundamental right balanced against the First Amendment rights of petitioners is the right that the General Assembly determined was "imperative," a citizen's *1253 right of access to "counseling and treatment" at Colorado medical facilities. At least one court has recognized that "the same constitution that protects the [anti-abortion protestors'] right to free speech also protects the [clinic's] right to abortion services and the patients' rights to receive those services." Northeast Women's Center, Inc. v. McMonagle, 868 F.2d 1342, 1348 (3d Cir.), cert. denied, 493 U.S. 901, 110 S.Ct. 261, 107 L.Ed.2d 210 (1989) (holding that anti-abortion protestors could be liable for violations under federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1964(c)). "The First Amendment does not demand that patients at a medical facility undertake Herculean efforts to escape the cacophony of political protests." Madsen, 512 U.S. at 772-73, 114 S.Ct. 2516.
The right to privacy was first recognized by Justice Brandeis in 1890 in an article he co-authored with Samuel D. Warren describing it as "the right to be let alone." Samuel D. Warren & Louis D. Brandeis, The Right to Privacy, 4 Harv. L.Rev. 193, 214-18 (1890). Justice Brandeis later expanded that statement when he explained that, "the right to be let alone [is] the most comprehensive of rights and the right most valued by civilized [individuals]." Olmstead v. United States, 277 U.S. 438, 478, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting), rev'd on other grounds, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).
The Supreme Court has recognized the right to privacy as one existing under the "penumbras" emanating from several different provisions contained within our federal constitution's Bill of Rights, specifically the First, Third, Fourth, Fifth, and Ninth Amendments, as well as the Fourteenth Amendment. See Griswold v. Connecticut, 381 U.S. 479, 484-85, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). In Eisenstadt v. Baird, the Supreme Court explained that "[i]f the right of privacy means anything, it is the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." 405 U.S. 438, 453, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972) (holding that a ban on distribution of contraceptive devices to unmarried persons violated the Equal Protection Clause); see also Skinner v. Oklahoma, 316 U.S. 535, 541, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942) (holding that statute directing involuntary sterilization on criminal defendant violated Equal Protection Clause, since "[m]arriage and procreation are fundamental to the very existence and survival of the race").
In Roe v. Wade, the Supreme Court held that the fundamental right of privacy "is broad enough to encompass a woman's decision whether or not to terminate her pregnancy." 410 U.S. 113, 153, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). In so doing, the Court recognized the potential harm to those exercising this right due to unwarranted interference by others. See id. The Court concluded that, because of the extensive history of the right to privacy and because of its support in our Constitution and case law, only a compelling reason would justify government interference with its exercise. See id. at 155-56, 93 S.Ct. 705.
In consideration of the foregoing fundamental rights, we therefore take great care in reviewing government action challenged as impermissible under the First Amendment. However, we conclude that the First Amendment can accommodate reasonable government action intended to effectuate the free exercise of another fundamental right, an individual's right to privacy, here represented by access to medical counseling and treatment.

IV.
We turn now to the principal issue upon which this case will be resolved: Whether section 18-9-122(3) is constitutional in light of the United States Supreme Court's decision in Schenck v. Pro-Choice Network, 519 U.S. 357, 117 S.Ct. 855, 137 L.Ed.2d 1 (1997). We conclude that the test used to determine the constitutionality of the injunction imposed in Schenck is inapplicable to the instant case. We further conclude that the appropriate test to be applied in this case is found in Ward v. Rock Against Racism, 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). We hold that section 18-9-122(3) is a *1254 reasonable time, place, and manner restriction and, hence, does not violate the proscriptions of the First Amendment. See n. 8, supra (recognizing that the First Amendment is applied to the State of Colorado by virtue of the Fourteenth Amendment).

A.
In Schenck, health care providers sought and obtained a preliminary injunction against anti-abortion protestors who engaged in allegedly illegal efforts to prevent individuals from obtaining abortions. See Schenck, 519 U.S. at 362, 117 S.Ct. 855. The Schenck injunction issued by the district court generally restricted the anti-abortion protestors' activities.[10]
In Schenck, the protestors challenged the injunction claiming that three aspects of the injunction unconstitutionally restricted their First Amendment rights. In particular, the protestors challenged (1) the "floating" fifteen-foot buffer zone around people and vehicles accessing the clinics; (2) the "fixed" fifteen-foot buffer zone around the clinic's doorways, driveways and parking lot entrances; and, (3) the "cease and desist" provision that forced anti-abortion protestors within the buffer zones to retreat fifteen feet from the targeted person. Schenck, 519 U.S. at 371, 117 S.Ct. 855. The Supreme Court held that, while the fixed buffer zone was constitutionally permissible, the floating buffer zone was unconstitutional. See id. at 377, 380, 117 S.Ct. 855. Applying the test it established in Madsen, 512 U.S. at 765, 114 S.Ct. 2516, for evaluating content-neutral injunctions that restrict speech, the Court held that the floating buffer zones burdened more speech than was necessary to serve the governmental interests underlying the issuance of the injunction. See Schenck, 519 U.S. at 377-79, 117 S.Ct. 855.
While we recognize certain factual similarities between Schenck and the instant case, that is, they both involve anti-abortion protestors' free speech claims regarding medical facilities which offer abortion counseling and they both create floating buffer zones, upon close examination, we cannot conclude that *1255 the test applied in Schenck is the appropriate standard by which to determine whether section 18-9-122(3) meets constitutional scrutiny. Our inability to agree with petitioners' reliance upon Schenck is based on an important distinction readily drawn between the two cases in the nature of the government regulation. Schenck involved a judicially created preliminary injunction drawn solely for the parties before the Court under the circumstances then existing. Here, to the contrary, section 18-9-122(3) is not the creature of our judiciary, but, instead, is a statute crafted by a coordinate branch of government, and is a rule of general application representing the public policy choices of the General Assembly of the State of Colorado.
As explained by the Supreme Court in Madsen, 512 U.S. at 763, 114 S.Ct. 2516, one of the differences between judge-drawn injunctions and statutes crafted in the political process is that, "[i]njunctions ... carry greater risks of censorship and discriminatory application than do general ordinances." As such, the General Assembly's enactment of section 18-9-122(3), which is not premised upon an evidentiary record for identifiable parties to litigation, but, instead intended for general application reaching all citizens, is entitled to greater deference than the judge-made injunction in Schenck. See Madsen, 512 U.S. at 763, 114 S.Ct. 2516 (applying "a somewhat more stringent application of general First Amendment principles" when determining the constitutionality of an injunction). Thus, we rely upon Ward not Schenck, and apply the appropriate standard for determining the constitutionality of a content-neutral statute.

B.
Petitioners also urge us to rely on the Ninth Circuit's decision in Sabelko v. City of Phoenix, 120 F.3d 161 (9th Cir.1997). We decline to do so. As here, Sabelko was decided pursuant to a Supreme Court remand in light of Schenck. In response to the conduct of anti-abortion protestors outside abortion facilities, Phoenix had enacted a city ordinance which created an eight-foot floating buffer zone and required counselors to withdraw upon request. See Sabelko, 120 F.3d at 162-63. Using the Ward test, the Ninth Circuit held the ordinance unconstitutional, concluding that it was not narrowly tailored. See Sabelko 120 F.3d at 165.
First, we note that authority from the Ninth Circuit, or any other lower federal court, is not controlling precedent for Colorado courts.
Although the Supremacy Clause demands that state law yield to federal law, neither federal supremacy nor any other principle of federal law requires that a state court's interpretation of federal law give way to a federal court's interpretation other than that of the United States Supreme Court. Thus, we are not bound by ... decisions of the lower federal courts.
Community Hosp. v. Fail, 969 P.2d 667, 671 (Colo.1998); see also Lockhart v. Fretwell, 506 U.S. 364, 375, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993) (Thomas, J., concurring) ("[N]either federal supremacy nor any other principle of federal law requires that a state court's interpretation of federal law give way to a (lower) federal court's interpretation.").
Second, we conclude that Sabelko is factually distinguishable from the instant case. In Sabelko, anti-abortion protestors were required to withdraw from an approaching person, upon request, even if the protestor remained standing still. See 120 F.3d at 164. In other words, under the Sabelko ordinance, if a protestor stood still and an individual came within eight feet, the protestor would have violated the ordinance. Section 18-9-122(3), in contrast, imposes no such duty upon petitioners because of the "knowingly approaches" requirement, discussed below. Indeed, under our interpretation of its language, and as both parties conceded at oral argument, the statute is not violated if petitioners stand still while inside the floating buffer zone. Hence, a petitioner who does not act to approach a person going into or coming out of a health care facility does not violate section 18-9-122(3), even if an individual comes within eight feet of him or her, as long as the petitioner does not "approach" the individual. See Part V. D., infra.

*1256 C.
While the protections afforded by the First Amendment are broad, they are not limitless. "The First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." Heffron v. ISKCON, 452 U.S. 640, 647, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981) (emphasis added). For example, if restriction of speech is facilitated by a content-neutral statute, "[e]xpression, whether oral or written or symbolized by conduct, is subject to reasonable time, place and manner restrictions." Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984); see also 7250 Corp. v. Board of County Comm'rs, 799 P.2d 917, 923-25 (Colo. 1990).
Because government cannot favor one idea over another, its regulation of speech must be content-neutral. See Mosley, 408 U.S. at 95, 92 S.Ct. 2286. A statute is content-neutral if it is "`justified without reference to the content of the regulated speech.'" Ward, 491 U.S. at 791, 109 S.Ct. 2746 (quoting Community for Creative Non-Violence, 468 U.S. at 295, 104 S.Ct. 3065). "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." Ward, 491 U.S. at 791, 109 S.Ct. 2746. In other words, a restriction on speech is content-neutral if the government makes no attempt to control the content of the speech protected and regulated thereby. See 7250 Corp., 799 P.2d at 925.
We note that both the trial court and the court of appeals found that section 18-9-122(3) is content-neutral, and that petitioners do not contend otherwise in this appeal. Further, our review of that section satisfies us that it is, indeed, content-neutral. The restrictions apply equally to all demonstrators, regardless of viewpoint, and the statutory language makes no reference to the content of the speech. Thus, we conclude that section 18-9-122(3) is content-neutral, and, therefore, we shall apply the test announced in Ward.

V.

A.
Before applying that standard, however, we first review the Supreme Court's holding in Ward. In Ward, New York City promulgated what it termed "Use Guidelines" (guidelines) in an attempt to regulate the sound amplification systems used by Rock Against Racism (RAR), an organization sponsoring musical concerts to convey a message on New York City property. See Ward, 491 U.S. at 787, 109 S.Ct. 2746. RAR in turn filed a successful motion for an injunction against enforcement of particular aspects of the guidelines. See id. at 788, 109 S.Ct. 2746. RAR also sought damages and a declaratory judgment striking down the guidelines as facially invalid. See id. The district court, applying the three-part test for determining the constitutionality of time, place or manner restrictions, found the guidelines valid. See id. at 789, 109 S.Ct. 2746. On appeal, the Second Circuit Court of Appeals reversed, based on its conclusion that the city could have used less restrictive means of regulating the volume of RAR's concert. See id.
The Supreme Court reversed the federal appellate court and upheld the constitutionality of the city's regulation of speech. In so doing, the Court utilized a two-part test for determining whether the content-neutral guidelines were constitutional. First, the Court inquired into whether the regulation was "`narrowly tailored to serve a significant governmental interest.'" Id. at 796, 109 S.Ct. 2746 (quoting Community for Creative Non-Violence, 468 U.S. at 293, 104 S.Ct. 3065). Here, we note that the Court emphasized that the Second Circuit erred in holding that the regulation had to be "`the least intrusive means' of achieving the desired end." Id. at 797, 109 S.Ct. 2746. Rather, the Court explained, "our cases quite clearly hold that restrictions on time, place or manner of protected speech are not invalid `simply because there is some imaginable alternative that might be less burdensome on speech.'" Id. (quoting United States v. Albertini, 472 U.S. 675, 689, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985)). The Court then clarified, *1257 [l]est any confusion on the point remain, we reaffirm today that a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests but that it need not be the least restrictive or least intrusive means of doing so.
491 U.S. at 798, 109 S.Ct. 2746.
The Court then proceeded to the second, and final, requirement for finding a legislatively imposed restriction on speech constitutional, that the restriction leave ample alternative channels of communication open. See id. at 802, 109 S.Ct. 2746. Here the Court explained the precise nature of permissible restriction of speech by stating, "[t]hat the city's limitations on volume may reduce to some degree the potential audience for respondent's speech is of no consequence, for there has been no showing that the remaining avenues of communication are inadequate." Id. Thus, absent a showing that the resultant, permissible means of communicating information are inadequate for petitioners to express themselves, section 18-9-122(3) will be deemed to have left open ample alternatives, and therefore, should be upheld as constitutional.
Applying the standard set forth in Ward here, we hold that section 18-9-122(3) is a reasonable restriction on the time, place, and manner of petitioners' speech and, therefore, is valid under the First Amendment for the reasons set forth below.

B.
First, section 18-9-122(3) is sufficiently and narrowly drawn to further a significant government interest. The statute mandates that an individual can only be convicted of criminal conduct under specified circumstances. Specifically, section 18-9-122(3) prohibits an individual from knowingly approaching another person within eight feet: (1) for the purpose of oral protest, counseling, education, leafletting, or displaying a sign to that person; (2) within 100 feet of a health care facility entrance; (3) without that person's consent.
Petitioners contend that section 18-9-122(3) is not narrow because, although the General Assembly declared its intent to curtail threatening conduct, it only prohibits protected speech. We disagree. The plain language of the statute indicates that it regulates speech and the conduct of "passing a leaflet or handbill," and "displaying a sign." Petitioners also contend that because their speech is directed to everyone, including "innocent" passers-by on the sidewalk who are not entering the health care facility, the statute unduly restricts speech that is intended to be only directed towards passers-by. Again, we disagree.
In rather simple but straight-forward language, the statute prohibits individuals from "knowingly approaching" a person within eight feet without that person's consent. Under section 18-9-122(3), a criminal statute, two requirements must be met to constitute a violation: (1) the mens rea requirement, "knowingly"; and (2) the actus reus requirement, "approaches." If one of the petitioners is standing still within the fixed buffer zone, and an individual walks toward him or her, the petitioner need not change his or her physical positioning to maintain eight feet of distance and thus avoid violating the statute, even if the approaching individual comes within less than eight feet of the petitioner. In other words, so long as the petitioner remains still, he or she cannot commit the actus reus of approaching, even though he or she may well have the requisite mens rea of "knowingly." Thus, in any scenario, petitioners are free to attempt to speak with whomever they wish and they will not violate the statute, so long as the mens rea and actus reus do not coincide. See Cooper v. People, 973 P.2d 1234, 1240-1241 (Colo.1999). Therefore, any risk of an inadvertent violation involving an "innocent" passer-by is, at most, de minimus.
Admittedly, under the statute, petitioners may not "knowingly approach" an individual within eight feet unless the petitioner has obtained the individual's consent.[11] What *1258 renders this statute less restrictive than both the injunction in Schenck and the ordinance in Sabelko is that under section 18-9-122(3), there is no duty to withdraw placed upon petitioners even within the eight-foot limited floating buffer zone. Thus, an inadvertent violation caused by a third party is not a legitimate threat here, as all parties conceded at oral arguments.
Petitioners also contend that the statute is not narrow enough because it applies to all health care facilities in Colorado. The fact that the statute may apply to persons entering health care facilities beyond those providing abortion counseling does not render the statute overly restrictive of speech. Rather, simply and purposefully, that fact renders the statute comprehensive. Indeed, the applicability of the statute to situations other than anti-abortion protesting is one reason we conclude that the statute is content-neutral. And we decline any invitation on this record to conclude that a facet of a statute that renders it content-neutral necessarily renders it overly broad.

C.
Second, we also hold that the statute furthers a significant government interest. After open public hearings that provide support for its public policy action we review today, the General Assembly declared in section 18-9-122(1) that "access to health care facilities for the purpose of obtaining medical counseling and treatment is imperative for the citizens of this state." Indeed, the statute was enacted, in part, through the General Assembly's police power, and by a General Assembly that was concerned with the safety of individuals seeking wide-ranging health care services, not merely abortion counseling and procedures. See Hearings on H.B. 93-1209 Before the House Judiciary Committee, 59th General Assembly, 1st Reg. Sess. (Audio Tape 93-8, Feb. 12, 1993, at 7:42 a.m.); see also part II. A., supra. Clearly, a fair reading of the legislative record reflects a legislative response to conduct that subjected citizens in Colorado to harassing, confrontational, and violent conduct. See part II. A., supra. We conclude that this express purpose furthers a significant government interest. See Schenck, 519 U.S. at 374-76, 117 S.Ct. 855 (holding that unimpeded access to clinics is a significant governmental interest); Madsen, 512 U.S. at 767, 114 S.Ct. 2516 (holding that the government has a substantial interest "in protecting a woman's freedom to seek lawful medical or counseling services in connection with her pregnancy"); Sabelko, 120 F.3d at 164 (same). Moreover, we note that it has long been acknowledged that government "may properly assert important interests in safeguarding health." Roe v. Wade, 410 U.S. at 150, 93 S.Ct. 705; see also Cox v. Louisiana, 379 U.S. 559, 562, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965).

D.
Finally, turning to the last requirement under Ward, that ample alternative channels of communication be left open, we similarly conclude that section 18-9-122(3) passes muster. Section 18-9-122(3) does not prohibit verbal communication, as petitioners contend. While the authority to regulate in some instances may include the power to deny, here petitioners' argument is not persuasive. Petitioners, indeed, everyone, are still able to protest, counsel, shout, implore, dissuade, persuade, educate, inform, and distribute literature regarding abortion. They just cannot knowingly approach within eight feet of an individual who is within 100 feet of a health care facility entrance without that individual's consent. As articulated so well by the Supreme Court in Ward, "[t]hat [section 18-9-122(3) ] may reduce to some degree the potential audience for [petitioners'] speech is of no consequence, for there has been no showing that the remaining avenues of communication are inadequate." Ward, 491 U.S. at 802, 109 S.Ct. 2746. In fact, although leafleting is deterred under the statute, petitioners have failed to offer any credible evidence that normal conversation or the communication of their message through demonstrative devices, such as placards and photographs, limits communication of their message. Moreover, because petitioners may knowingly approach up to eight feet of *1259 any person, in the parking lot, on the sidewalk, and even at the health care facility door, under the statute at issue here, we fail to see how petitioners' audience is diminished at all. On its face, there is nothing that prohibits protestors from being seen and heard by those accessing health care facilities as well as passers-by.
It is important to emphasize that in Schenck the Supreme Court did not strike down all "floating" buffer zones per se, as the petitioners essentially contend. In striking down the floating buffer zones created by the injunction in Schenck, the Court recognized that "there may well be other ways to both effect ... separation and yet provide certainty (so that speech protected by the injunction's terms is not burdened)...." 519 U.S. at 378-79, 117 S.Ct. 855. In fact, it was the uncertainty of how to comply with the injunction about which the Supreme Court appeared most concerned. The Court stated that because the protestor would have to move with the individual, and because the clinic sidewalks were only seventeen-feet wide, "it would be quite difficult for a protestor who wishes to engage in peaceful expressive activities to know how to remain in compliance with the injunction. This lack of certainty leads to a substantial risk that much more speech will be burdened than the injunction by its terms prohibits." Id. at 378, 117 S.Ct. 855.
Here, in contrast, the statute is so narrowly drawn that these concerns are alleviated. First, protestors must only maintain a distance of eight feet, not fifteen, which allows for normal conversational tones. Second, in Schenck, a protestor could have easily violated the injunction merely by standing still. For example, if an individual approached a protestor who was standing still, that protestor would violate the injunction. Here, in contrast, the mens rea "knowingly" requirement ensures that scenario will not be possible. Even if a protestor is approached by an individual, the protestor will only violate the statute if, along with the several other requirements of the statute, he or she "knowingly approaches" the individual for the purpose of passing a leaflet or engaging in oral protest. The inadvertent violation, or at least the possibility of such a violation, is substantially avoided by the plain terms of the statute. In Schenck, in order to avoid violating the injunction, the protestors were obligated to maintain sufficient separation of fifteen feet at all times. There, the movement of a third party could place the protestors in the position of having violated the injunction. Here, to the contrary, petitioners may actually stand still and though individuals may approach within eight feet of petitioners, the requisite actus reus of "approach[ing]" is not met. Thus, we do not believe that, even under the Schenck test, section 18-9-122(3) burdens more speech than is necessary.

VI.
In sum, we hold that section 18-9-122(3) represents a fair legislative balancing of the "right to protest or counsel against certain medical procedures" while protecting "a person's right to obtain medical counseling and treatment." In addition, we find the General Assembly's statutory response a fair accommodation of two fundamental rights. We also conclude that "the right to be let alone," Olmstead, 277 U.S. at 478, 48 S.Ct. 564, is consistent with the well-accepted notion that "[t]he First Amendment does not guarantee the right to communicate one's views ... in any manner that may be desired." Heffron, 452 U.S. at 647, 101 S.Ct. 2559 (emphasis added).
Thus, we hold that section 18-9-122(3) is a valid time, place and manner restriction, a permissible legislative response designed to assure safety and order for citizens entering and leaving Colorado health care facilities. It is content-neutral, is narrowly tailored to serve a significant governmental interest, and leaves open ample alternative channels of communication. Accordingly, we affirm the judgment of the court of appeals.
NOTES
[1] The issue upon which we granted certiorari was:

Whether the court of appeals erred in holding that section 18-9-122, 6 C.R.S. (1997), was constitutional upon the United States Supreme Court's remand to the court of appeals to reconsider the statute under Schenck v. Pro-Choice Network, 519 U.S. 357, 117 S.Ct. 855, 137 L.Ed.2d 1 (1997).
[2] Petitioners' complaint alleged the statute was unconstitutional under both a facial and an as-applied challenge. However, as the statute had not yet been enforced, the trial court correctly ruled that the challenge was facial only. See High Gear & Toke Shop v. Beacom, 689 P.2d 624, 628 (Colo.1984). Therefore, our review here is limited to reviewing the facial challenge.
[3] When originally filed, Gale Norton, as Attorney General, and Roy Romer, as Governor, were officers of the state of Colorado, sued in their official capacities. However, in January 1999, Bill Owens and Ken Salazar succeeded to the offices of Governor and Attorney General. Hence, by operation of law they are nominal parties in this proceeding, representing the State of Colorado in their official capacities only. See C.A.R. 43(c)(1) ("When a public officer is a party to an appeal or other proceedings in the appellate court in his official capacity and during its pendency dies, resigns, or otherwise ceases to hold office, the action does not abate and his successor is automatically substituted as a party.").
[4] Comprised of six subsections, section 18-9-122 provides:

(1) The general assembly recognizes that access to health care facilities for the purpose of obtaining medical counseling and treatment is imperative for the citizens of this state; that the exercise of a person's right to protest or counsel against certain medical procedures must be balanced against another person's right to obtain medical counseling and treatment in an unobstructed manner; and that preventing the willful obstruction of a person's access to medical counseling and treatment at a health care facility is a matter of statewide concern. The general assembly therefore declares that it is appropriate to enact legislation that prohibits a person from knowingly obstructing another person's entry to or exit from a health care facility.
(2) A person commits a class 3 misdemeanor if such person knowingly obstructs, detains, hinders, impedes, or blocks another person's entry to or exit from a health care facility.
(3) No person shall knowingly approach another person within eight feet of such person, unless such other person consents, for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling with such other person in the public way or sidewalk area within a radius of one hundred feet from any entrance door to a health care facility. Any person who violates this subsection (3) commits a class 3 misdemeanor.
(4) For the purposes of this section "health care facility" means any entity that is licensed, certified, or otherwise authorized or permitted by law to administer medical treatment in this state.
(5) Nothing in this section shall be construed to prohibit a statutory or home rule city or county or city and county from adopting a law for the control of access to health care facilities that is no less restrictive than the provisions of this section.
(6) In addition to, and not in lieu of, the penalties set forth in this section, a person who violates the provisions of this section shall be subject to civil liability, as provided in section 13-21-106.7, C.R.S.
[5] The penalty for committing a class 3 misdemeanor is a fine between fifty and one hundred fifty dollars, and up to seven months imprisonment. See § 18-1-106, 6 C.R.S. (1998).
[6] While the statute creates a floating buffer zone, we take care to make clear the following. The statute's limited floating buffer zone exists only within the 100-foot fixed buffer zone that protects entrances to health care facilities. Hence, there is no limitation placed upon a citizen's First Amendment conduct under the questioned statute outside the fixed buffer zone or more than 100 feet from the entrance. Thus, so long as a person intending to enter or exit a health care facility is more than 100 feet from the entrance, individuals exercising their First Amendment rights may engage in speech within eight feet of the person using the health care facility.
[7] Although the legislative history of section 18-9-122 attributes intimidating and violent conduct to anti-abortion protestors generally, we assume, for purposes of this facial challenge to the statute, that petitioners have not engaged in, and do not intend to engage in, such dangerous and harassing conduct. We further note that instances of violence, including bombings of abortion clinics and other life threatening violence perpetrated against doctors and other medical personnel who provide abortion counseling and services, are not speech but, rather, constitute illegal conduct not protected by the First Amendment.
[8] By force of the Civil War Amendments, in particular the Fourteenth Amendment, the First Amendment applies to the states via the Due Process Clause of the Fourteenth Amendment. See 44 Liquormart, Inc. v. Rhode Island, 517 U.S. 484, 489 n. 1, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996); Walker v. Colorado Springs Sun, Inc., 188 Colo. 86, 99, 538 P.2d 450, 457 (1975), overruled on other grounds by Diversified Management, Inc. v. Denver Post, Inc., 653 P.2d 1103, 1106 (Colo. 1982). "`The freedom of speech ... [is] among the fundamental personal rights and liberties which are secured to all persons by the Fourteenth Amendment against abridgment by a state.'" Burson v. Freeman, 504 U.S. 191, 196, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992) (quoting Thornhill v. Alabama, 310 U.S. 88, 95, 60 S.Ct. 736, 84 L.Ed. 1093 (1940)).
[9] This egalitarian nature of the First Amendment was evinced by the Civil Rights Era of the 1950's through the 1970's including (1) peaceful demonstrations and marches, some of which were lead by Rev. Dr. Martin Luther King, Jr., and (2) the work of the NAACP and the NAACP Legal Defense Fund, Inc., among others. See NAACP v. Claiborne Hardware, 458 U.S. 886, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982) (boycott seeking desegregation of public facilities, improved government services in black neighborhoods, and hiring of African Americans as police officers, social workers, and store clerks upheld against state tort laws). Influenced by Ghandi's philosophy of nonviolence, Dr. King led nonviolent demonstrations that helped lead to the passage of the Civil Rights Act of 1964 and the Voting Rights Act of 1965. A recipient of the Nobel Peace Prize, Dr. King was felled by the violence of an assassin's bullet. Dr. King's birthday is a national holiday observed in Colorado and throughout the United States.
[10] The injunction provided:

Defendants, the officers, directors, agents, and representatives of defendants, and all other persons whomsoever, known or unknown, acting in their behalf or in concert with them, and receiving actual or constructive notice of this Order, are:
1. Enjoined and restrained in any manner or by any means from:
(a) trespassing on, sitting in, blocking, impeding, or obstructing access to, ingress into or egress from any facility, including, but not limited to, the parking lots, parking lot entrances, driveways, and driveway entrances, at which abortions are performed in the Western District of New York;
(b) demonstrating within fifteen feet from either side or edge of, or in front of, doorways or doorway entrances, parking lot entrances, driveways and driveway entrances of such facilities, or within fifteen feet of any person or vehicle seeking access to or leaving such facilities, except that the form of demonstrating known as sidewalk counseling by no more than two persons as specified in paragraph (c) shall be allowed;
(c) physically abusing, grabbing, touching, pushing, shoving, or crowding persons entering or leaving, working at or using any services at any facility at which abortions are performed; provided, however, that sidewalk counseling consisting of a conversation of a non-threatening nature by not more than two people with each person or group of persons they are seeking to counsel shall not be prohibited. Also provided that no one is required to accept or listen to sidewalk counseling, and that if anyone or any group of persons who is sought to be counseled wants to not have counseling, wants to leave, or walk away, they shall have the absolute right to do that, and in such event all persons seeking to counsel that person or group of persons shall cease and desist from such counseling, and shall thereafter be governed by the provisions of paragraph (b) pertaining to not demonstrating within fifteen feet of persons seeking access to or leaving a facility. In addition, it is further provided that this right to sidewalk counseling as defined herein shall not limit the right of the Police Department to maintain public order or such reasonably necessary rules and regulations as they decide are necessary at each particular demonstration site;
(d) using any mechanical loudspeaker or sound amplification device or making any excessively loud sound which injures, disturbs, or endangers the health or safety of any patient or employee of a health care facility at which abortions are performed, nor shall any person make such sounds which interfere with the rights of anyone not in violation of this Order;
(e) attempting, or inducing, directing, aiding, or abetting in any manner, others to take any of the actions described in paragraphs (a) through (d) above.
Schenck, 519 U.S. at 366-67, 117 S.Ct. 855.
[11] We emphasize here that this floating buffer zone exists only within 100 feet of the entrance of a health care facility, and not outside the fixed buffer zone, such as parking lots and sidewalks outside the 100 foot fixed buffer zone.