**WORLD WIDE STREET PREACHERS' FELLOWSHIP, Jack Oliver, and Keith Swihart Plaintiffs**

v.

**The CITY OF OWENSBORO, Kentucky Defendant**

**No. CIV.A. 404CV117M.**

United States District Court,
W.D. Kentucky,
Owensboro Division.

Oct. 1, 2004.

John A. Majors, Morgan & Pottinger, Louisville, KY, Leonard G. Brown, III, Clymer & Musser, PC, Lancaster, PA, for World Wide Street Preachers' Fellowship, Jack Oliver, Keith Swihart, Plaintiffs.

David C. Fowler, Patrick D. Pace, Kamuf, Yewell & Pace, Owensboro, KY, for City of Owensboro, Kentucky, Defendant.

## MEMORANDUM OPINION AND ORDER

MCKINLEY, District Judge.

This matter is before the Court upon a motion by Plaintiffs, World Wide Street Preachers' Fellowship, and two of its members, Jack Oliver and Keith Swihart. [DN 3]. Plaintiffs move for injunctive relief pursuant to Fed.R.Civ.P. 65 to enjoin the Defendant, City of Owensboro, Kentucky, from interfering with their desire to display a three by four foot pro-life sign depicting a photographic image of an aborted fetus in the public forums of the City of Owensboro.[1] The Court conducted

---

**1.** Additionally, Plaintiffs filed a claim for monetary damages but withdrew that claim at the hearing.

an evidentiary hearing and granted Plaintiffs' motion to consolidate the hearing with a trial on the merits pursuant to Fed.R.Civ.P. 65(a)(2). Fully briefed, this matter stands ripe for decision. For the reasons set forth below, Plaintiffs' request for injunctive relief is **GRANTED**.

## I. FACTS

The World Wide Street Preachers Fellowship is a ministerial fellowship organized under the Anabaptist Churches of North America consisting of Christian street preachers joined together for the furtherance of open air evangelism. The fellowship has members in most of the fifty states as well as several foreign countries. The street preachers often challenge what they view as national and cultural sin. The Plaintiffs, Jack Oliver and Keith Swihart, are members of the World Wide Street Preachers Fellowship.

On July 3, 2004, the Plaintiffs displayed several signs, including an anti-abortion sign, during a well-attended street concert on Frederica Street, the main thoroughfare through Owensboro, Kentucky. The Owensboro Police Department received numerous complaints that evening about the Plaintiffs' sign, which contained a detailed, color photograph of an aborted fetus. Sgt. Jim Parham of the Owensboro Police Department became alarmed at the reaction of several citizens to the graphic nature of the anti-abortion sign. His concern centered on complaints from citizens regarding the exposure of young children to such a photo and the possibility that the continued display of it could escalate into a physical altercation. Sgt. Parham, understanding that he was dealing with a free speech issue, contacted the County Attorney to ask what actions, if any, the police could take to defuse the situation without abridging the free speech rights of the Plaintiffs. Sgt. Parham testified that the County Attorney told him that the police could prevent the display of the sign if it was likely to create a riot or start a fight. Thereafter, the police asked the Plaintiffs to cease displaying the sign or risk being cited for disorderly conduct, at which point the Plaintiffs agreed to voluntarily stop displaying their anti-abortion sign.

On the next evening, July 4th, during the Independence Day festivities at English Park, the Plaintiffs were again present to engage in street preaching. Plaintiff, Keith Swihart, attempted to display an anti-abortion sign. This sign is similar to the one that had been displayed the prior evening. It is approximately three by four feet in size and contains an enlarged color photograph of a mutilated fetus with the words "Homeland Security—Abortion Name: Malachi 21 weeks preborn" thereon. Sgt. Parham and the police department took immediate action. They asked Mr. Swihart to put away his sign and when he refused he was cited for disorderly conduct. The citation read as follows:

> Subject involved in anti-abortion protest during July 4th celebration at English Park. The protest was proceeding with no problems until subject produced large colored picture of a mutilated baby. This was causing public alarm and likely to cause a physical confrontation. He refused to put the sign away.

The police confiscated the anti-abortion sign, issued the citation and released Mr. Swihart. The police did not interfere in any other way with the Plaintiffs' other activities that night.

The Plaintiffs wish to continue to utilize the pro-life sign in their street preaching activities and fear if they do so they will be arrested. Therefore, Plaintiffs ask the Court to enjoin the City of Owensboro from interfering with their displaying the anti-abortion sign.

## II. DISCUSSION

This is a case involving competing interests. The City of Owensboro, through its police department, in an effort to shield and protect some of its citizens abridged the fundamental free speech rights of others. It should be noted at the outset that the police department acted in a very professional manner in dealing with the Plaintiffs. In fact, the Plaintiffs commended the police department for their conduct.

However, as in any free speech case, the City of Owensboro faces a steep challenge in justifying the restriction on speech. That is because this country has a long history of embracing the concept of free speech. We are guaranteed this right in the First Amendment to our Constitution, and the free speech protections under the First Amendment have long been made applicable to the states by the Fourteenth Amendment. *Gitlow v. New York,* 268 U.S. 652, 666, 45 S.Ct. 625, 69 L.Ed. 1138 (1925). The U.S. Supreme Court's view on the role of free speech in our society helps us to understand why restrictions on speech are so limited:

> A function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea.

*Terminiello v. Chicago,* 337 U.S. 1, 4, 69 S.Ct. 894, 93 L.Ed. 1131 (1949).

■ This right to free speech, however, is not absolute. Courts have recognized that certain types of speech are not worthy of protection:

> Allowing the broadest scope to the language and purpose of the Fourteenth Amendment, it is well understood that

the right of free speech is not absolute at all times and under all circumstances. There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or "fighting" words (internal citations omitted).

The Supreme Court has determined that the above narrowly limited classes of speech are not worthy of protection. Since most speech is protected by the First Amendment, the City of Owensboro can prevail here only if it can show that the Plaintiffs' speech falls into a category which is not worthy of protection or if the restriction on the Plaintiffs' speech is necessary to serve a compelling governmental interest.

The City of Owensboro advances several arguments to support its position. First, the City contends that the Plaintiffs' sign depicting an aborted fetus constitutes "fighting words" under applicable precedent. Second, the City of Owensboro argues that the Plaintiffs' speech is unprotected because it could have led to violence. Finally, the City asserts that it can prohibit the Plaintiffs' speech because it has a compelling state interest in protecting children from viewing such graphic images as portrayed in the anti-abortion sign used by the Plaintiffs. It should be noted at this juncture the Plaintiffs' street preaching focuses on a variety of other societal issues besides abortion. The words, signs and methods they use in condemning these other perceived sins can be quite unsettling, intrusive and, as the testimony bore out, inciting. However, the sole issue before the Court is the utilization by the Plaintiffs of the approximately three by four foot anti-abortion sign containing an enlarged color photograph of a mutilated fetus with the words "Homeland

Security—Abortion Name: Malachi 21 weeks preborn" thereon. No opinion is expressed herein as to the propriety of any other words or methods used by the Plaintiffs during their street preaching. Furthermore, no opinion is expressed herein as to any other constitutionally permissible ways to restrict the Plaintiffs speech in a content-neutral manner. Rather, this opinion addresses only whether the Plaintiffs' sign depicting an aborted fetus constitutes permissible free speech within the parameters of First Amendment case law.

### 1. Fighting Words

Fighting words-those that provoke immediate violence-are not protected by the First Amendment. *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 927, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982). The fighting words exception is very limited, though, because it is inconsistent with the general principle of free speech recognized in our First Amendment jurisprudence. *Sandul v. Larion*, 119 F.3d 1250, 1255 (6th Cir.1997)(internal citations omitted). Thus, the Court must take care to determine the narrow bounds of the fighting words exception to the First Amendment by examining prior case law. Over sixty years ago, the Supreme Court set out what speech constitutes fighting words and why such speech is not worthy of protection:

> [T]hose which by their very utterance inflict injury or tend to incite an immediate breach of the peace. It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act

would raise no question under that instrument (internal citations omitted). *Chaplinsky*, 315 U.S. at 572, 62 S.Ct. 766.

■ From the time of *Chaplinsky* to the present day, the Supreme Court has illustrated the narrow bounds of the fighting words exception to the First Amendment. The Supreme Court has held that a jacket which read "F__ the Draft" does not constitute fighting words. *Cohen v. California*, 403 U.S. 15, 26, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971). In holding that those words on a jacket did not constitute fighting words, the Supreme Court remarked that fighting words were "those personally abusive epithets which, when addressed to the ordinary citizen, are as, a matter of common knowledge, inherently likely to provoke violent reaction." *Id.* at 20, 91 S.Ct. 1780. In another case, the Supreme Court noted that fighting words are those which an onlooker would consider a "direct personal insult or an invitation to exchange fisticuffs." *Texas v. Johnson*, 491 U.S. 397, 409, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989). Thus, fighting words are epithets (1) directed at the person of the hearer, (2) inherently likely to cause a violent reaction, *and* (3) playing no role in the expression of ideas. *Cannon v. City and County of Denver*, 998 F.2d 867, 871 (10th Cir.1993).

■ To support its argument that the anti-abortion sign of the Plaintiffs constitutes fighting words, the City of Owensboro cites a case from the California Appellate courts, *H–CHH Associates v. Citizens for Representative Gov't*, 193 Cal.App.3d 1193, 1216, 238 Cal.Rptr. 841 (1987). The City contends that the case held that pictures of aborted fetuses constitute fighting words. Actually, the California court did not describe pictures of aborted fetuses as examples of fighting words but rather described them as gruesome displays or highly inflammato-

ry slogans. *Id.* The City has not cited, nor has the Court been able to find, any other case that considers a sign depicting images of an aborted fetus to be "fighting words." [2]

In light of Supreme Court precedent, the Court cannot find that the Plaintiffs' sign, no matter how gruesome or how objectionable it may be, constitutes "fighting words." The Plaintiffs' speech, whether one agrees with it or not, was certainly not of "slight social value." Rather, their speech was a powerful, albeit graphic commentary on a societal debate that divides many Americans. Furthermore, their speech was not directed at any particular person. Their speech commented on a highly significant social issue and was calculated to challenge people, to unsettle them, and even to anger them, but not to insult them. Such social commentary is not only protected under Supreme Court precedent but also is highly valued in the marketplace of ideas in our free society.

### 2. Hostile Audience

■ Though the Plaintiffs' speech itself does not constitute fighting words, the Court must also consider the context of the speech to determine whether it was inherently likely to cause a violent reaction, thus inciting a riot. As a general matter, the First Amendment "knows no heckler's veto." [3] *Robb v. Hungerbeeler,* 370 F.3d 735, 743 (8th Cir.2004); *See also Forsyth County v. Nationalist Movement,* 505 U.S. 123, 134–35, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992) (stating that "speech cannot be...punished or banned simply because it might offend a hostile mob"). States have attempted to regulate speech based on the context of that speech, but

they must have an actual basis for so doing. *See Boos v. Barry,* 485 U.S. 312, 335, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988) (finding that a government must regulate speech based on actual violence rather than the mere belief that speech with a certain content will induce violence).

The City maintains that the police were concerned about the possibility that continued display of the anti-abortion sign could escalate into a physical altercation or disturbance. What is peculiar about this stance is that the testimony revealed that there was threatened violence toward the street preachers on the night is question but that it was not caused by the anti-abortion sign. Instead, it was caused by the street preachers' comments toward citizens on issues ranging from fornication to race. Despite the near violence in those instances the police did not attempt to restrict the Plaintiffs' activities and methods in any way. Again, it should be noted that this opinion deals not with the possibility of violence due to the street preachers' other antics, rather, it deals only with the use of the anti-abortion sign.

The City cites *Frye v. Kansas City, Missouri Police Department,* 375 F.3d 785 (8th Cir.2004) for the proposition that "the protection afforded to offensive messages does not always embrace offensive speech that is so intrusive that an unwilling audience could not avoid it." *Id.* at 791. Moreover, the City argues, that "the government need not wait for accidents to justify safety regulations." *Id.* The City's reliance on *Frye* is misplaced. Notwithstanding Plaintiffs' argument that Frye is wrongly decided, it is distinguishable in that the court engaged in a time, place and

---

2. The City's citation to *Tatton v. City of Cuyahoga Falls,* 116 F.Supp.2d 928 (N.D.Ohio 2000), a case with similar facts, is of little value since the court there granted judgment for the City on immunity grounds. The court

did not reach the question as to whether a first amendment violation occurred.

3. A "heckler's veto" empowers an audience to cut off the expression of a speaker with whom it disagrees.

manner analysis which is inapplicable for a content based restriction on speech. The City concedes that its restriction on the Plaintiffs' speech was based on its content. Furthermore, the Kansas City police did not ban the signs, but merely asked that they be moved back further off the road.

The City of Owensboro contends that a mere anticipated breach of peace is enough to shut down First Amendment activity. Courts have held to the contrary:

> Undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression. Any departure from absolute regimentation may cause trouble. Any variation from the majority's opinion may inspire fear. Any word...that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk, *Terminiello v. Chicago,* 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949); and our history says that it is this sort of hazardous freedom-this kind of openness-that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society.

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.,* 393 U.S. 503, 508–09, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969).

In *Feiner v. New York,* 340 U.S. 315, 317, 71 S.Ct. 303, 95 L.Ed. 295 (1951), the Supreme Court dealt with a situation involving a hostile crowd. Feiner was cited for disorderly conduct while addressing a crowd of 75 or 80 people, both blacks and whites, and the audience became excited over the content of his speech and began to express a difference of opinion over the speaker's message. *Id.* at 317, 71 S.Ct. 303. The crowd threatened to attack the speaker if the police did not stop him. The Supreme Court upheld Feiner's conviction and held that "[W]hen clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order, appears, the power of the State to prevent or punish is obvious." *Id.* at 320, 71 S.Ct. 303 (citing *Cantwell v. Connecticut,* 310 U.S. 296, 308, 60 S.Ct. 900, 84 L.Ed. 1213 (1940)).

Although seemingly helpful to the City's argument, the facts of this case are easily distinguishable from those in *Feiner.* Feiner was urging his opinion on the crowd with the intent that a riot ensue. The Sixth Circuit has stated that "[t]he purpose of the First Amendment is to encourage discussion, and it is intended to protect the expression of unpopular as well as popular ideas. Accordingly, hostile public reaction does not cause the forfeiture of the constitutional protection afforded a speaker's message so long as the speaker does not go beyond mere persuasion and advocacy of ideas and attempts to incite to riot." *Glasson v. City of Louisville,* 518 F.2d 899, 905 (6th Cir.1975). Here, there is no evidence that the Plaintiffs had any such intent. To the contrary, carrying a picture of an aborted fetus, without any further action, constitutes only an attempt to persuade the listener and falls well short of meeting the standard for "incitement to riot" set out in *Feiner.*

### 3. Protection of Children

 Even if the City of Owensboro cannot show that the Plaintiffs' speech contained fighting words or was likely to incite a riot, their restriction of Plaintiffs' speech may pass constitutional muster if they can show that they acted in furtherance of a compelling government interest. The City of Owensboro argues that it has a "significant, compelling and legitimate" interest in protecting young children from such frightening images. *Olmer v. City of*

*Lincoln,* 192 F.3d 1176, 1180 (8th Cir. 1999).

■ A facially content-based restriction on political speech in a public forum must be subjected to exacting scrutiny. *Burson v. Freeman,* 504 U.S. 191, 198, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992). That is, the State must show that the "regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Id.* The Supreme Court has frequently recognized that the protection of children, in a variety of contexts, is a compelling state interest. *See, e.g., Denver Area Educ. Telecommunications Consortium v. FCC,* 518 U.S. 727, 755, 116 S.Ct. 2374, 135 L.Ed.2d 888 (1996). On other occasions, though, the Supreme Court has not referred to the state's interest in protecting children as compelling. For instance, the Supreme Court in *Reno v. ACLU,* 521 U.S. 844, 849, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997) recognized that protecting children from offensive or indecent pictures is a legitimate and important interest, but the Court does not refer to it as compelling.

■ As for the question of narrow tailoring, the Government is not required to employ the least restrictive means conceivable. *Greater New Orleans Broad. Ass'n v. United States,* 527 U.S. 173, 188, 119 S.Ct. 1923, 144 L.Ed.2d 161 (1999). It must, however, demonstrate narrow tailoring of the challenged regulation to the asserted interest—"a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served." *Id.* Furthermore, the availability of less burdensome alternatives to reach the stated goal signals that the fit between the legislature's ends and the means chosen to accomplish those ends may be too imprecise to withstand First Amendment scrutiny. *Rubin v. Coors*

*Brewing Co.,* 514 U.S. 476, 486–487, 115 S.Ct. 1585, 131 L.Ed.2d 532 (1995).

The Plaintiffs point out that the City's assertion that these images are harmful to children is without any evidentiary support. However, assuming that they are harmful and that protection of children from these images is a compelling state interest, the City of Owensboro cannot show that its actions were narrowly drawn to achieve that compelling state interest. The City made no attempt to establish any type of "fit" between its interest of protecting children and the street preachers' interest in exercising free speech. While depriving the Plaintiffs of the sign enabled the City of Owensboro to attain its compelling state interest, the means employed did not account in any way for a less restrictive alternative that would enable the street preachers to exercise their right to free speech. Completely banning the signs is not narrow tailoring.

Also problematic, as the Plaintiffs point out, is the City's reliance that the images are too "graphic." Who decides when an image is too "graphic?" Is it the police or the heckler? In either case, the term is too vague to be constitutional. As such, the City of Owensboro's actions are unconstitutional.

## III. CONCLUSION

After a careful review of this matter, the Court finds that the Plaintiffs' speech does not constitute fighting words nor did the Plaintiffs intend to incite violence. Furthermore, by depriving the Plaintiffs of their sign, the City of Owensboro did not narrowly tailor its restrictions on the Plaintiffs' speech. Plaintiffs are entitled to the injunctive relief they seek. A separate order enjoining the Defendants will be entered.

## ORDER

The Court having found that the Defendant's actions is confiscating the Plaintiffs' anti-abortion sign constituted a violation of the First Amendment, and being otherwise sufficiently advised,

**IT IS HEREBY ORDERED** that Defendants are enjoined from engaging in content based restrictions of the Plaintiffs' display of an approximately three by four foot anti-abortion sign containing an enlarged color photograph of a mutilated fetus with the words "Homeland Security—Abortion Name: Malachi 21 weeks preborn" thereon.

**THIS IS A FINAL AND APPEALABLE ORDER AND THERE IS NO CAUSE FOR DELAY.**