2012 COA 72

SAINT JOHN'S CHURCH IN THE WIL-
DERNESS, Charles I. Thompson, and
Charles W. Berberich, Plaintiffs–Appel-
lees,

v.

Kenneth Tyler SCOTT and Clifton
Powell, Defendants–
Appellants.

No. 11CA0508.

Colorado Court of Appeals,
Div. IV.

April 26, 2012.

Rehearing Denied Aug. 2, 2012.

Faegre Baker Daniels LLP, Russell O. Stewart, Denver, Colorado, for Plaintiffs–Appellees.

Hackstaff Law Group, LLC, Rebecca Messall, Denver, Colorado, for Defendants–Appellants.

Opinion by Judge WEBB.

¶ 1 This appeal follows the remand ordered in *St. John's in the Wilderness v. Scott,* 194 P.3d 475 (Colo.App.2008) *(St. John's I),* which contains a detailed description of the evidence and procedural history. Because no new evidence was introduced on remand,[1] this opinion provides only limited background. The order on remand restricting demonstrations in six buffer zones around the Church is modified and, as modified, affirmed.

---

1. Defendants' motion to present additional evidence was denied on the ground that the evidence they sought to introduce pertained only to enforcement of the injunction and did not address whether its terms burdened no more speech than necessary in the six buffer zones. They do not appeal this ruling.

## I. Introduction

¶ 2 Following the initial bench trial, the court resolved claims for private nuisance and conspiracy to commit private nuisance brought by plaintiffs, St. John's Church in the Wilderness and two parishioners, Charles I. Thompson and Charles W. Berberich, against defendants, Kenneth Tyler Scott and Clifton Powell. Defendants had demonstrated their opposition to abortion and homosexuality on the public street and sidewalk across the street from the Church, during an outdoor Palm Sunday service that began on Church property, by shouting and carrying signs, some of which included images of aborted fetuses.

¶ 3 As relevant here, the court's factual findings included: Scott's voice was so loud that it substantially interfered with the outdoor services;[2] the volume and nature of the demonstration, together with the graphic and gory nature of defendants' posters, caused several of those attending services to show "crying, trembling, fear, and anger"; children present were frightened by defendants' posters; and because of defendants' actions, 85 to 100 parishioners declined to participate in a second outdoor service.

¶ 4 The court issued a permanent injunction prohibiting defendants from engaging in the following acts:

(i) At all times on all days, from entering the premises and property of St. John's Cathedral.

(ii) During worship and preparation for worship, from a period beginning one-half hour before and ending one-half hour after a religious event or series of events, including but not limited to worship services on Sundays between the hours of 7:00 a.m. and 1:00 p.m., from focused picketing, congregating, patrolling, demonstrating or entering that portion of the public right-of-way shown on [the checkered portions a

---

2. Contrary to defendants' assertion that plaintiffs must take the public forum as they find it, including demonstrators, here the trial court found that defendants' protest interfered with services on Church property well before parishioners used the public sidewalk for a procession into the cathedral.

map of the Church and its surroundings; see *St. John's I*, 194 P.3d at 486].

(iii) During worship and preparation for worship, from a period beginning one-half hour before and ending one-half hour after a religious event or series of events, including but not limited to worship services on Sundays between the hours of 7:00 a.m. and 1:00 p.m., from whistling, shouting, yelling, use of bullhorns, auto horns, sound amplification equipment or other sounds in areas [in checkered portion of map of the Church and its surroundings; *see id.*].

(iv) At all times on all days, from blocking, impeding, inhibiting, or in any other manner obstructing or interfering with access to, ingress into and egress from any building or parking lot owned by St. John's.

(v) At all times on all days, from encouraging, inciting, or securing other persons to commit any of the prohibited acts listed herein.

¶ 5 Following a lengthy discussion of government restrictions on "communicative activity" that occurred "[i]n public forums," *St. John's I*, 194 P.3d at 482–85, the division affirmed the judgments against defendants, and affirmed the injunction in part, vacated it in part, and remanded for further findings. It concluded that the threshold requirements for imposing injunctive relief had been met and that sufficient findings supported the prohibitions against obstructing access to the Church, violating the injunction through surrogates, and the time restrictions on defendants' picketing and noise-making. However, because the record did not show that defendants' "mere presence" on Church property would cause irreparable harm, it vacated the prohibition against defendants' entry onto Church premises and property "at all times on all days." Finally, it concluded that further findings were necessary to determine whether the restrictions on action in the buffer zones burdened no more speech than necessary to serve a significant government interest.

¶ 6 On remand, the trial court modified the injunction as follows:

- In paragraph 3(i), the prohibition on defendants' entry onto Church premises or property "at all times on all days" (originally paragraph i) was deleted and replaced with a prohibition against entry *"on days on which [defendants] engage in any conduct proscribed by this injunction."*

- Paragraphs (ii) and (iii), proscribing focused picketing and noise-making, were deleted and replaced with a new paragraph 3(ii), prohibiting defendants from:

 (a) shouting or yelling at or using any noise amplification device(s) in a manner reasonably calculated to: (1) disturb parishioners' ability to worship; (2) interfere with the plaintiff church's ability to use its property for worship services and/or worship related events; (3) *cause parishioners to become physically upset;* and (4) deter parishioners from participating in worship services and/or worship-related events on plaintiff church's property; and (b) *displaying large posters or similar displays depicting gruesome images of mutilated fetuses or dead bodies in a manner reasonably likely to be viewed by children under 12 years of age* attending worship services and/or worship-related events at plaintiff church.

(Emphasis added.) The three italicized phrases are the primary thrust of defendants' current appeal.

## II. Law of the Case

¶ 7 Defendants first contend *St. John's I* wrongly abridged their First Amendment rights, and because controlling law has changed since *St. John's I* was decided, this division need not follow it as law of the case. We decline defendants' invitation to revisit matters resolved in the trial court's initial order and upheld in *St. John's I.*

### A. The Law of the Case Doctrine

¶ 8 "Conclusions of an appellate court on issues presented to it as well as rulings logically necessary to sustain such conclusions become the law of the case." *Super Valu Stores, Inc. v. Dist. Court,* 906 P.2d 72, 78–79 (Colo.1995). The law of the case doctrine protects parties from relitigating settled issues, on the grounds that courts

generally "refuse to reopen what has been decided." *People ex rel. Gallagher v. Dist. Court,* 666 P.2d 550, 553 (Colo.1983) (internal quotation marks and citation omitted). It recognizes that "litigation must end somewhere." *People v. Roybal,* 672 P.2d 1003, 1005 n. 6 (Colo.1983) (internal quotation marks and citation omitted).

¶ 9 In proceedings on remand, a trial court must follow the pronouncements of the appellate court. *Kuhn v. State,* 897 P.2d 792, 795 (Colo.1995). In a later appeal, however, when the decision in question issued from the same appellate court, a different division of that court may exercise its discretion and decline to apply the law of the case doctrine, but only "if it determines that the previous decision is no longer sound because of changed conditions or law, or legal or factual error, or if the prior decision would result in manifest injustice." [3] *Vashone-Caruso v. Suthers,* 29 P.3d 339, 342 (Colo.App. 2001); *see Mitchell v. Ryder,* 104 P.3d 316, 323 (Colo.App.2004).

### B. Analysis

#### 1. Change in Controlling Law

¶ 10 Defendants argue that *Snyder v. Phelps,* —— U.S. ——, 131 S.Ct. 1207, 179 L.Ed.2d 172 (2011), and *Brown v. Entertainment Merchants Ass'n,* —— U.S. ——, 131 S.Ct. 2729, 180 L.Ed.2d 708 (2011), changed the controlling law in this case. Because these cases follow established precedent, they do not warrant reexamining *St. John's I.*[4]

#### a. Snyder v. Phelps

¶ 11 *Snyder* held that demonstrators' speech at the funeral of a military service member was protected by the First Amendment from state tort liability in an action brought by the deceased's father. At the funeral, the demonstrators carried signs with statements such as "God Hates the USA/ Thank God for 9/11," "Thank God for Dead Soldiers," "God Hates Fags," and "America is Doomed." 131 S.Ct. at 1214. They stood on public land, behind a temporary fence, approximately 1,000 feet from the church where the funeral was held and separated from the church by several buildings. *Id.* For about thirty minutes before the service began, they sang hymns and recited Bible verses while holding their signs, but "did not yell or use profanity." *Id.* Although the funeral procession passed within 200 to 300 feet of the demonstrators, the father could see only the tops of their signs, and could not read what was written on them. *Id.*

¶ 12 The Supreme Court reviewed the court of appeals' decision setting aside a jury verdict in the father's favor for intentional infliction of emotional distress, intrusion upon seclusion, and civil conspiracy. It concluded that the speech "was at a public place on a matter of public concern," and "is entitled to 'special protection' under the First Amendment. Such speech cannot be restricted simply because it is upsetting or arouses contempt." *Id.* at 1219. Therefore, it held that the speech would not support liability for intentional infliction of emotional distress, where the protest had not interfered with the funeral. *Id.* at 1220. And because the protest was well away from the funeral, neither could liability for intrusion upon seclusion be upheld. *Id.*

¶ 13 *Snyder*'s statement that speech cannot be sanctioned merely for offending its listeners follows existing precedent. *See, e.g., Cohen v. California,* 403 U.S. 15, 21, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971); *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 210–11, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975). Indeed, defendants describe Snyder as "emphasiz[ing] fundamental law," and cite a Supreme Court case from 1992 [5] for the princi-

---

**3.** In their reply brief, defendants raise factual error and manifest injustice as grounds for this division to decline to follow the law of the case. However, we will not consider arguments raised for the first time in a reply brief. *People v. Czemerynski,* 786 P.2d 1100, 1107 (Colo.1990).

**4.** *St. John's I,* 194 P.3d at 482–83, 485–88, relies heavily on *Madsen v. Women's Health Center,*

*Inc.,* 512 U.S. 753, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994). *Snyder,* —— U.S. at ——, 131 S.Ct. at 1218, cites but does not limit *Madsen.*

**5.** *Forsyth Cnty. v. Nationalist Movement,* 505 U.S. 123, 134–35, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992).

ple that "the First Amendment has always protected speech that 'upsets' listeners." In concluding that speech on matters of public concern is "at the heart of the First Amendment's protection" and "is entitled to special protection," *Snyder* cites with approval cases from 1985 and 1983. 131 S.Ct. at 1215.[6] And in its conclusion that speech on matters of public concern in a public place "cannot be restricted simply because it is upsetting or arouses contempt," the Court cites additional prior precedent.[7] Thus, while we are bound by the Court's formulation of First Amendment law, *Snyder* did not announce a new analysis applicable to the trial court's initial injunction or the order on remand.[8]

¶ 14 Moreover, the facts in *Snyder* distinguish it from the present case. Unlike the trial court's findings here, the demonstration "did not in itself disrupt that funeral." *Id.* at 1220. In further contrast to the case before us, the demonstrators in *Snyder* did not shout, they were located 1,000 feet from the funeral, and their signs could not be read from the funeral procession. *Compare id.* *with St. John's I*, 194 P.3d at 478. Therefore, the similarities between *Snyder* and this case—protest at a religious service, signs that could offend, and underlying state tort claims—do not make *Snyder* dispositive.

b. *Brown v. Entertainment Merchants Ass'n*

¶ 15 Likewise, *Brown* reaffirmed longstanding First Amendment doctrine. In striking a California law prohibiting the sale or rental of "violent video games" to minors,

the Court explained that while states may proscribe selling obscene materials to minors, "violence is not part of the obscenity that the Constitution permits to be regulated." *Brown*, 131 S.Ct. at 2735. Rather, " '[s]peech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them.' " *Id.* at 2736 (quoting *Erznoznik*, 422 U.S. at 213–14, 95 S.Ct. 2268). The Court also cited *Winters v. New York*, 333 U.S. 507, 519, 68 S.Ct. 665, 92 L.Ed. 840 (1948) (striking a law banning the collection of violent stories as a form of obscenity). Therefore, *Brown* did not redraw the historic line between obscenity and other categories of speech.

¶ 16 Rather, in *Brown* the state sought to prevent children from buying violent video games out of concern that such games "cause minors to act aggressively," presumably by desensitizing them to the effects of violence. —— U.S. at ——, 131 S.Ct. at 2739 (emphasis omitted). The legislation failed constitutional scrutiny in part because the Court concluded that California had provided no compelling evidence the games had such an effect. *Id.*

¶ 17 Here, different psychological harm is at issue. The trial court found that "[t]he posters were highly disturbing to ... children," *St. John's I*, 194 P.3d at 484, which defendants do not challenge. Thus, defendants' reliance on *Brown* to argue that First Amendment protection of violent video

6. *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758–759, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985) (opinion of Powell, J.); *Connick v. Myers*, 461 U.S. 138, 145, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).

7. *Texas v. Johnson*, 491 U.S. 397, 414, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989); *Hurley v. Irish–American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557, 574, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995); *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 510, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984); *Boos v. Barry*, 485 U.S. 312, 322, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988).

8. *See* Erwin Chemerinsky, *Not A Free Speech Court*, 53 Ariz. L. Rev. 723, 723–24 (2011) ("The case is important because the Court reaffirmed

one of the most basic principles of the First Amendment: speech cannot be punished, or speakers held liable, just because the speech is offensive, even deeply offensive."); Alan Brownstein & Vikram David Amar, *Afterthoughts on Snyder v. Phelps*, 2011 Cardozo L. Rev. de novo 43, 43 (2011) ("From a scholarly and professional perspective, the United States Supreme Court's decision in *Snyder v. Phelps* added little to the development of free speech doctrine.... Given the clear consensus of the Justices that an intentional infliction of emotional distress ... claim and damage award, on the facts of this case, violated the free speech clause of the First Amendment, one can only wonder why the Court thought it appropriate to grant review in this matter in the first place.").

games now requires that we reconsider the role which protecting children played in the trial court is misplaced.

### 2. Applying Law of the Case

¶ 18 *St. John's I*, 194 P.3d at 481–82, expressly addressed the following arguments that defendants raise again:

1. The trial court erred by enjoining defendants from "impeding, blocking, inhibiting or in any other manner obstructing or interfering with access to, ingress into and egress from any building or parking lot" and from "encouraging, inciting, or securing other persons to commit any of the prohibited acts listed herein."

2. The trial court erred in finding that defendants' religious speech in a traditional public forum constituted a private nuisance, the basis of a conspiracy to commit private nuisance, and the basis for a permanent injunction.

¶ 19 We have rejected defendants' assertions that *St. John's I* did not apply First Amendment law and that a change in this law relieves us of the law of the case doctrine. To the extent that we have discretion to revisit these issues, as another division of the same court, we decline to do so because we consider *St. John's I* both thorough and well reasoned. *See Buckley Powder Co. v. State,* 70 P.3d 547, 557 (Colo.App.2002) (declining to deviate from the law of the case established in another division's decision where no change in controlling law).

¶ 20 However, treating *St. John's I* as the law of the case does not limit our review of four issues:

¶ 21 First, whether the trial court's further findings concerning the place and manner restrictions on defendants' speech—prohibiting them from demonstrating in any of the buffer zones around the church, by focused picketing, congregating, patrolling, demonstrating, or shouting, yelling, or using bullhorns, auto horns, or sound amplification—burden no more speech than necessary

to serve the interests protected by the injunction.

¶ 22 Second, whether the trial court followed the mandate in *St. John's I* that because plaintiffs did not prove irreparable harm would result unless defendants were prohibited from entering the Church's premises or property on all days at all times, the prohibition against such entry must be vacated.

¶ 23 Third, whether the restriction on speech "reasonably calculated to ... cause parishioners to become physically upset," wording not in the initial injunction, impermissibly burdens defendants' First Amendment rights.

¶ 24 Fourth, whether the prohibition against "displaying large posters or similar displays depicting gruesome images of mutilated fetuses or dead bodies in a manner reasonably likely to be viewed by children under 12 years of age," also added to the injunction on remand, is content-neutral, and if not, whether it is narrowly tailored to serve a compelling state interest.

¶ 25 We decline to address the first issue because the Opening Brief makes no specific arguments against the trial court's further findings on the buffer zones.[9] *Leef v. Burlington Northern & Santa Fe Ry. Co.,* 49 P.3d 1196, 1197 (Colo.App.2002) (appellate court would not consider claim raised at trial where plaintiff did not address the issue in his appellate briefs). The next section of this opinion addresses whether the trial court complied with the remand instructions. The last section deals with the two new prohibitions added on remand.

### III. Compliance with the Remand Instructions

¶ 26 Defendants contend the trial court failed to obey the following direction in *St. John's I:*

There is no evidence that [defendants] entered the Church, or the Church's property, created a private nuisance inside the

---

9. According to the Reply Brief, defendants do not attack the order on remand "based on whether it 'burdens more speech than is necessary to serve the interests protected.'" Rather they challenge the order, including the buffer zones, "because they penalize protected speech based on its content."

Church, or conspired to do so. Nor is there evidence that their *mere presence* on Church property injures the Church, the named parishioners, other parishioners, or children. Therefore we conclude that the Church has not proved that irreparable harm will result unless [defendants] are prohibited, on all days and at all times, from entering the Church's premises or property.

*St. John's I,* 194 P.3d at 481 (emphasis in original). However, they do not challenge this part of the remand order on First Amendment grounds.

¶ 27 "When an appellate court remands a case with specific directions to enter a particular judgment or to pursue a prescribed course, a trial court has no discretion except to comply with such directions." *Musgrave v. Indus. Claim Appeals Office,* 762 P.2d 686, 687–88 (Colo.App.1988). We review a trial court's compliance with prior appellate rulings de novo. *Hardesty v. Pino,* 222 P.3d 336, 339 (Colo.App.2009).

¶ 28 On remand, the trial court removed "at all times on all days" and added "on days on which they engage in any conduct proscribed by this injunction." Thus, the original prohibition was vacated. And for the following reasons, we conclude that the court did not abuse its discretion with this new language. *Hunter v. Mansell,* 240 P.3d 469, 477 (Colo.App.2010) ("The entry or denial of injunctive relief is a discretionary decision of the trial court that will not be disturbed on appeal absent an abuse of that discretion.").

¶ 29 While *St. John's I* recognized that plaintiffs had failed to prove defendants' "mere presence" caused irreparable harm, the division noted record support for the trial court's finding that recurrence of defendants' protests would "irreparably harm and interfere with the named parishioners' ability to worship at the Church and the Church's ability to use its property for worship services." 194 P.3d at 480–81. Hence, defendants' entry into the church on days when they had engaged in prohibited conduct would allow them to defeat the purpose of the injunction if they brought their demonstration into the Church itself.

¶ 30 Further, if defendants engaged in proscribed activities, ceased those activities, and entered the Church on the same day, their presence would also interfere with parishioners' ability to worship because of legitimate fear over what defendants might do. The trial court's "same day" limitation on defendants entering the Church implicitly recognized parishioners' legitimate and ongoing fear of defendants.[10] *See Thomas v. Bove,* 687 P.2d 534, 536 (Colo.App.1984) (upholding trial court's implicit findings where they had support in the record).

¶ 31 Therefore, we decline to disturb this part of the injunction.

### IV. The Two New Prohibitions

¶ 32 Defendants contend the new prohibitions against speech that causes parishioners "to become physically upset" and carrying posters "depicting gruesome images of mutilated fetuses or dead bodies" impermissibly restrict their First Amendment rights. Because defendants challenge these prohibitions on different grounds, we consider them separately.

### A. Standard of Review

¶ 33 Whether an injunction violates a constitutional right is a question of law to be reviewed de novo. *Evans v. Romer,* 854 P.2d 1270, 1274–75 (Colo.1993). However, we defer "to the factual judgment of the trial court," absent an abuse of discretion. *Dallman v. Ritter,* 225 P.3d 610, 620–21 (Colo. 2010)

### B. Speech Causing Parishioners to Become Physically Upset

¶ 34 Defendants argue that because "the First Amendment has always protected speech which 'upsets' listeners," enjoining speech which causes parishioners to become physically upset is unconstitutional. We de-

---

10. In its order on remand, the trial court found that one parishioner "felt threatened and abused" by defendants' conduct outside of the church. Other parishioners withdrew their children from church activities to protect them from defendants' conduct.

cline to address this argument. Nevertheless, for the following reasons, we vacate this part of the injunction. *See May Dep't Stores Co. v. State ex rel. Woodard,* 863 P.2d 967, 980 (Colo.1993) (an appellate court can "approve or limit the injunctive remedy").

¶ 35 First, at oral arguments, plaintiffs conceded that the prohibition on defendants' conduct "reasonably calculated to ... cause parishioners to become physically upset" covers little if any conduct not already prohibited as "disturb[ing] parishioners' ability to worship" or "interfer[ing] with the plaintiff church's ability to use its property for worship services." *See PBM Products, LLC v. Mead Johnson & Co.,* 639 F.3d 111, 128 (4th Cir.2011) ("It is well established that injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.").

¶ 36 Second, in some circumstances, the right of free speech must be "accommodat[ed]" or "reconcil[ed] ... with another right fundamental in our constellation of rights." *Hill v. Thomas,* 973 P.2d 1246, 1252 (Colo.1999) (citing *Burson v. Freeman,* 504 U.S. 191, 210, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992)), *aff'd sub nom. Hill v. Colorado,* 530 U.S. 703, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000). The Supreme Court has recognized that the government may restrict speech on " 'a showing that substantial privacy interests are being invaded in an essentially intolerable manner.' " *Snyder,* —— U.S. at ——, 131 S.Ct. at 1220 (citing *Erznoznik,* 422 U.S. at 210–11, 95 S.Ct. 2268; *Cohen,* 403 U.S. at 21, 91 S.Ct. 1780). Such interests exist in and around one's home, *Frisby v. Schultz,* 487 U.S. 474, 484–85, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988), and in the right to access medical counseling and treatment. *Hill v. Thomas,* 973 P.2d at 1253. However, the Court has not addressed whether, as relevant here, that interest extends to parishioners' right to worship and a church's right to use its property for worship. *St. John's I,* 194 P.3d at 484–85.

¶ 37 Third, plaintiffs have not cited, nor have we found, any First Amendment case dealing with a restriction on conduct because it is physically upsetting. This lack of precedent leaves us uninformed whether such a restriction protects only the reaction of a reasonable person. And even if so limited, the restriction would still have to be reconciled with the general principle that disagreement with the content of a message usually cannot trump the exercise of First Amendment rights. *Forsyth Cnty. v. Nationalist Movement,* 505 U.S. 123, 134, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992) ("Listeners' reaction to speech is not a content-neutral basis for regulation."); *see also Snyder* —— U.S. at ——, 131 S.Ct. at 1219–20 (noting that "there is no indication that the picketing in any way interfered with the funeral service itself" and "any distress occasioned by Westboro's picketing turned on the content and viewpoint of the message conveyed, rather than any interference with the funeral itself").

¶ 38 Under these circumstances, "the principle of judicial restraint requires us to 'avoid reaching constitutional questions in advance of the necessity of deciding them.' " *Developmental Pathways v. Ritter,* 178 P.3d 524, 535 (Colo.2008) (quoting *Lyng v. Nw. Indian Cemetery Protective Ass'n,* 485 U.S. 439, 445, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988)). Therefore, we vacate the "cause parishioners to become physically upset" restriction because, as plaintiffs conceded, prohibiting "shouting or yelling ... in a manner reasonably calculated to ... disrupt parishioners' ability to worship" and the Church's "ability to use its property for worship services" adequately protects plaintiffs' interests.

### C. Gruesome Images

¶ 39 Defendants argue that the new prohibition against using "large posters or similar displays depicting gruesome images of mutilated fetuses or dead bodies in a manner reasonably likely to be viewed by children under 12 years of age attending worship services and/or worship-related events at plaintiff church" is content-based, and therefore subject to strict scrutiny. We agree. However, we recognize the presence of a compelling governmental interest in protecting children from disturbing images, and we further conclude that the prohibition is narrowly tailored. Therefore, we decline to modify this part of the injunction.

### 1. The Prohibition Is Content–Based

¶ 40 We agree with *St. John's I* [11] that a content-neutral restriction of speech imposed by injunction must " 'burden no more speech than necessary to serve a significant government interest.' " 194 P.3d at 482 (quoting *Madsen*, 512 U.S. at 765, 114 S.Ct. 2516). In contrast, the government may regulate speech based on its content only where the restriction survives strict scrutiny, which requires that it be "necessary to serve a compelling state interest" and "narrowly drawn to achieve that end." *St. John's I*, 194 P.3d at 482 (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983)).

¶ 41 Content-neutrality turns on whether government restrictions of expressive activity are "justified without reference to the content of the regulated speech." *Clark v. Cmty. for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984). "The government's purpose is the controlling consideration," and "[a] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989).

¶ 42 For example, in *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986), the Court upheld a zoning ordinance limiting the location of adult movie theaters. Although the ordinance treated adult theaters differently from other kinds of theaters, it did not intend to restrict adult films, but to alleviate the secondary effects of such theaters on the community, namely "to prevent crime, protect the city's retail trade, maintain property values, and generally protect and preserve the quality of the city's neighborhoods, commercial districts, and the quality of urban life." *Id.* at 48, 106 S.Ct. 925 (internal quotation marks, brackets, and citation omitted). In the Court's view, the city permissibly chose "to treat certain movie theaters differently because they have markedly different effects upon their surroundings." *Id.* at 49, 106 S.Ct. 925.

¶ 43 However, the Court later held that because "the emotive impact of speech on its audience is not a 'secondary effect' " but a primary effect, limiting the psychological impact of speech is a content-based purpose. *Boos v. Barry*, 485 U.S. 312, 321, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988) (striking a statute intended to protect the dignity of foreign diplomatic personnel by preventing display of signs critical of a foreign government within 500 feet of its embassy). Distinguishing *Renton*, the *Boos* majority explained that if the city's purpose in passing the zoning ordinance had been "to prevent the psychological damage it felt was associated with viewing adult movies, then analysis of the measure as a content-based statute would have been appropriate." *Id.* Because the ordinance at issue in *Boos* was "justified *only* by reference to the content of" the protestors' signs and the effect that content would have on foreign dignitaries, it required analysis as a content-based restriction. *Id.* (emphasis in original); *see also Madsen*, 512 U.S. at 773, 114 S.Ct. 2516 (striking portion of injunction banning "images observable to ... patients inside the Clinic" on the ground that "the only plausible reason a patient would be bothered by 'images observable' inside the clinic would be if the patient found the expression contained in such images disagreeable").

¶ 44 We have found no case, nor have plaintiffs cited any, distinguishing between the psychological impact on adults and that on children in determining whether a restriction is content-neutral. *Cf. Ctr. for Bio–Ethical Reform, Inc. v. Los Angeles Cnty. Sheriff Dep't*, 533 F.3d 780, 790 (9th Cir.2008) ("There is ... no precedent for a 'minors' exception to the prohibition on banning speech because of listeners' reaction to its content."). Thus, because under *Boos* the children's distress here at seeing defendants' posters would be a primary effect of defendants' speech, we conclude that any restric-

---

11. Because this prohibition was added to the injunction on remand, the content-neutrality issues it raises were not before the division in *St. John's I*. We read the portion of that opinion addressing content-neutrality as general background, not part of its holding, and therefore reach our own conclusions on the language now before us.

tion solely to prevent this distress is content-based.

¶ 45 This conclusion conforms to lower federal court decisions that have similarly recognized posters showing aborted fetuses as protected speech and restrictions on such signs to prevent an audience's distress as content-based. *See, e.g., United States v. Marcavage,* 609 F.3d 264, 283 (3d Cir.2010) (striking government restrictions imposed because visitors to historical site were upset by anti-abortion demonstrator's posters); *Ctr. for Bio–Ethical Reform,* 533 F.3d at 787 (statute proscribing disruption of school unconstitutional as applied to anti-abortion protestor because disruption arose from students' distress at seeing demonstrator's posters); *see also Operation Save America v. City of Jackson,* ¶¶ 71–73 (ban on displaying images of aborted fetuses was content-based restriction).

¶ 46 And even if images of dismembered fetuses constitute a "visual assault," *Hill,* 530 U.S. at 716, 120 S.Ct. 2480, for many anti-abortion demonstrators the gruesomeness of the images *is* the message, and necessary to express their viewpoint. *See Marcavage,* 609 F.3d at 283 ("[T]he images [of aborted fetuses] are jarring, their shock value unmistakable. Presumably, that was the point."); *Becker v. F.C. C.,* 95 F.3d 75, 81 (D.C.Cir. 1996) ("In many instances, of course, it will be impossible to separate the message from the image, when the point of the [message] is to call attention to the perceived horrors of a particular issue."); *Grove v. City of York,* 342 F.Supp.2d 291, 303 (M.D.Pa.2004) ("Here, there is no doubt that those signs displaying pictures of aborted fetuses were essential to Plaintiffs' message ... which ... was intended to shock the public's conscious [sic] through the 'display of human carnage.' ").

¶ 47 Therefore, we further conclude that the prohibition against defendants' use of "large posters or similar displays depicting gruesome images of mutilated fetuses or dead bodies" must satisfy strict scrutiny based on a compelling interest and a narrowly tailored restriction.

2. The Prohibition Is Justified by a Compelling Government Interest

¶ 48 The Supreme Court has "repeatedly recognized the governmental interest in protecting children from harmful materials." *Reno v. Am. Civil Liberties Union,* 521 U.S. 844, 875, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997). For example, in upholding a law preventing the sale of "girlie" magazines to children under seventeen, the Court said "we have recognized that even where there is an invasion of protected freedoms, the power of the state to control the conduct of children reaches beyond the scope of its authority over adults." *Ginsberg v. New York,* 390 U.S. 629, 638, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968) (internal quotation marks and citation omitted). And in *Sable Communications of California, Inc. v. F.C.C.,* 492 U.S. 115, 126, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989), the Court identified the government's interest in "protecting the physical and psychological well-being of minors" as "compelling."

¶ 49 Lower federal courts have concluded that exposure to graphic images can cause such psychological harm. *Olmer v. City of Lincoln,* 192 F.3d 1176, 1180 (8th Cir.1999) (concluding the government has a compelling interest in "protecting very young children from frightening images"); *cf. Lefemine v. Davis,* 732 F.Supp.2d 614, 623 (D.S.C.2010) (striking ban on anti-abortion protesters' graphic posters because while "the court agrees that protecting children may be a compelling interest," the ban was not narrowly tailored), *aff'd sub nom. Lefemine v. Wideman,* 672 F.3d 292 (4th Cir.2012); *see also Operation Save America,* 2012 WY 51, ¶¶ 76–78, 275 P.3d 438; ("The need to protect the psychological well being of children has been recognized as a compelling government interest."); *Bering v. SHARE,* 106 Wash.2d 212, 721 P.2d 918, 935 (1986) (upholding permanent injunction prohibiting anti-abortion protesters from using the words "murder," "kill," and their derivatives because state has "compelling interest in avoiding subjection of children to the physical and psychological abuse inflicted by the picketers' speech").

¶ 50 Here, the trial court made the following findings that defendants' posters caused or could cause psychological harm to the approximately 200 children who took part in the procession and were exposed to defendants' posters:

- Parents were concerned about the effect the posters had upon their children;

- The posters' gruesome images were highly disturbing to children in the congregation apart from any message they intended to convey;

- The priest's seven-year-old daughter buried her face in her hymnal as she passed defendants' posters and remained upset about the images several days later.

Defendants do not challenge these findings.

¶ 51 Therefore, we also conclude that the government's compelling interest in protecting children from exposure to certain images of aborted fetuses and dead bodies supports this part of the injunction.

### 3. The Prohibition Is Narrowly Tailored

 ¶ 52 For a content-based speech restriction to satisfy the second strict scrutiny prong, "the curtailment of free speech must be actually necessary to the solution." *Brown,* —— U.S. at ——, 131 S.Ct. at 2738. Hence, we must "ask whether the challenged regulation is the least restrictive means among available, effective alternatives." *Ashcroft v. Am. Civil Liberties Union,* 542 U.S. 656, 666, 124 S.Ct. 2783, 159 L.Ed.2d 690 (2004). Here, we conclude that it is.

¶ 53 Blanket bans on signs with images of aborted fetuses have not survived the narrow tailoring requirement. *See, e.g., World Wide Street Preachers' Fellowship v. City of Owensboro,* 342 F.Supp.2d 634, 641 (W.D.Ky. 2004) (citing anti-abortion protestors for disorderly conduct after they displayed signs at a street concert and a park was not narrowly tailored to interest of protecting children because it left protestors no options for exercising right to free speech); *Lefemine,* 732 F.Supp.2d at 624 (requiring anti-abortion

protestors to remove signs entirely or be cited for breach of the peace not narrowly tailored to state interest of preventing children from seeing signs from the main road); *cf. Frye v. Kansas City Missouri Police Dep't,* 375 F.3d 785, 792 (8th Cir.2004) (government restriction allowing demonstrators to display signs further from a busy road narrowly tailored to serve compelling interest in public safety).

¶ 54 Here, however, no such blanket ban has been imposed. Defendants are prohibited only from displaying "large" [12] posters "in a manner reasonably likely to be viewed by children under 12 years of age attending worship services and/or worship-related events at plaintiff church," from one half-hour before to one half-hour after religious events, within the buffer zones described in *St. John's I.* This prohibition does not prevent them from displaying their posters in other public space, even if children might see those posters. Nor do defendants suggest that they would be subject to citations for disorderly conduct or breach of the peace merely by displaying their posters in the buffer zones at other times. The injunction also does not prevent them from having leaflets available with similar images for distribution to interested listeners. *See Hill,* 530 U.S. at 715, 120 S.Ct. 2480 (upholding injunction as narrowly tailored in part because it allowed demonstrators to peacefully hand leaflets to persons approaching an abortion clinic).

¶ 55 Moreover, identifying the prohibited content as "gruesome images of mutilated fetuses" is the least restrictive means available to protect young children who are attending worship services. *Cf. Olmer v. Lincoln,* 23 F.Supp.2d 1091, 1102 (D.Neb.1998) ("[T]he defendants' argument—we cannot effectively ban gruesome pictures that frighten children without banning a great deal of other speech—is not accurate."), *aff'd,* 192 F.3d 1176 (8th Cir.1999). "Gruesome" means "inspiring horror or repulsion; fearful, grisly, hideous." *Webster's Third New International Dictionary* 1005 (1986). Defendants cite

---

**12.** Defendants do not argue that the injunction must be more specific as to the size of the posters that are restricted. According to the trial court's findings, the posters were approximately three-and-a-half by four-and-a-half feet.

no case, nor have we found one, holding the term to be overbroad. To the contrary, it reasonably describes the kind of image likely to cause young children psychological harm. Nor do defendants suggest any comparable term that would allow them to display images less likely to frighten children.

¶ 56 Although the restriction on images of "dead bodies" presents a closer question, we conclude that this phrase is also narrowly tailored. Not all images of dead bodies are inherently frightening to children. (For instance, a picture of a corpse laid out for a funeral would look like someone sleeping.) However, "gruesome" also modifies "dead bodies." While defendants correctly note that the crucifixion itself depicts a dead body, they do not point to any evidence in the record that the Palm Sunday services involved graphic images or representations of the crucifixion that were inherently gruesome. *See Pasquale v. Ohio Power Co.*, 187 W.Va. 292, 418 S.E.2d 738, 752 (1992) ("[T]here is no blood or gruesome wound pictured."); *cf. State v. Barber*, 206 P.3d 1223, 1237 (Utah Ct.App.2009) (determining gruesomeness of photographic evidence includes "whether the photograph is in color" and "whether it is an enlargement or close-up shot").

¶ 57 Therefore, we decline to disturb the phrase "gruesome images of aborted fetuses or dead bodies" in the remand injunction.

¶ 58 As modified, the order on remand is affirmed.

Judge FURMAN and Judge BOORAS concur.