Opinion by JUDGE J. JONES
¶ 1 Edite Dusalijeva appeals the probate court's orders appointing her and Mara B. Blumberg as temporary co-guardians of L.B. and its order appointing Ms. Blumberg, Dace Carlin, and Dane Carlin as permanent co-guardians of L.B. We affirm.
I. Background
¶ 2 L.B. was born on December 9, 2009. Her mother died in 2010. L.B.'s father, Juris Berzins, hired Ms. Dusalijeva as L.B.'s nanny in late 2011. Later, Mr. Berzins and Ms. Dusalijeva developed a romantic relationship.
¶ 3 Mr. Berzins had dual citizenship in the United States and Latvia, as does L.B. He had residences in Denver, Latvia, and France. L.B. attended school in Denver in 2012, 2013, and 2015; she never attended school in Latvia.
¶ 4 On January 1 or 2, 2015, L.B., Mr. Berzins, and Ms. Dusalijeva arrived in Colorado. Before that, they had lived in Latvia for a year. Mr. Berzins bought plane tickets for them to return to Latvia on May 24, 2015. The probate court found, with record support, that Mr. Berzins planned for the three to spend the summer in Latvia and to return to Denver in time for L.B. to attend school.
¶ 5 Mr. Berzins died on February 26, 2015, at his home in Denver. He left two executed wills. The first was prepared for and signed by him in Latvia in 2012 (2012 Will). The second was prepared for and signed by him in Denver in 2014 (2014 Will). The 2014 Will expressly revoked all prior wills, identified Mr. Berzins as being "of the City and County of Denver," and said that it should be interpreted under the laws of Colorado.
¶ 6 The 2014 Will left the residuary estate in trust for the benefit of L.B. and Ms. Blumberg (Mr. Berzins' daughter) or Ms. Blumberg's descendants. It also said that the trust will terminate when L.B. attains age twenty-five, with the primary purpose of the trust being "to provide for the health, education, support and maintenance of [L.B.]." The 2014 Will suggested that the trustees "consider making regular payments to any person having custody of [L.B.] while she is a *179 minor" and "consider receiving an annual accounting or budget from such person for the expenses of [L.B.]." It also requested that the trustees "consider retaining as an asset of the trust the condominium ... in the Candlewyck Condominiums ... in Denver, Colorado ... to provide a residence for [L.B.] and her guardian while they reside in Denver." Both the 2012 and 2014 Wills appointed Ms. Dusalijeva as L.B.'s guardian in case of Mr. Berzins' death.
¶ 7 After Mr. Berzins died, Ms. Dusalijeva and Ms. Blumberg jointly initiated the probate court action. On March 9, 2015, through joint counsel, Ms. Dusalijeva and Ms. Blumberg sought to establish a temporary co-guardianship for L.B.'s benefit for six months. The petition alleged that this was necessary because "[a]s a result of the death of [L.B.'s] only parent, there is no one with legal authority to care for the Minor" and "[t]here is no person currently acting as a Guardian or Conservator for [L.B.] in Colorado or elsewhere." At a hearing on March 12, 2015, the magistrate entered an order for temporary co-guardianship between Ms. Dusalijeva and Ms. Blumberg, to expire on May 11, 2015. On May 4, 2015, the co-guardians jointly filed a motion for an extension of the appointment. The magistrate granted this motion without a hearing on May 6, 2015, for another sixty days, to expire on July 11, 2015.
¶ 8 On April 17, 2015, without informing the Denver Probate Court, Ms. Dusalijeva filed a petition for guardianship over L.B. with the Latvian orphan's court. Neither she nor her Latvian counsel informed the orphan's court of the Denver Probate Court proceedings or the 2014 Will. In April 2015, the orphan's court issued a letter arguably implying that Mr. Berzins had appointed Ms. Dusalijeva as L.B.'s guardian. However, it later issued a letter saying that the April 2015 letter was "not an order" and that the court had "not made any decision to appoint a guardian" for L.B. because it lacked information regarding Mr. Berzins' 2014 Will.
¶ 9 After the May 2015 extension of the temporary co-guardianship, a dispute arose between Ms. Dusalijeva and Ms. Blumberg about whether L.B. should continue to live with Ms. Dusalijeva and reside in Latvia, where Ms. Dusalijeva testified she wished to live, or whether L.B. should reside in the United States. They also disagreed about whether Mr. Berzins intended for L.B. to be educated in the United States or in Latvia. The probate court found, again with record support, that Mr. Berzins wanted L.B. to be educated in Denver.
¶ 10 After a four-day guardianship hearing beginning on August 3, 2015, the probate court appointed Ms. Blumberg and Dace and Dane Carlin as permanent co-guardians of L.B. The Carlins are a Latvian couple living in Denver. They had met and cared for L.B. shortly after Mr. Berzins' death and continued to see L.B. thereafter. The probate court found that the Carlins could provide L.B. with an upbringing similar to what Ms. Blumberg had described as her experience growing up and the lifestyle that Mr. Berzins would have wanted for L.B.
II. Discussion
¶ 11 Ms. Dusalijeva primarily contends that the probate court did not have subject matter jurisdiction. Additionally, she contends that the probate court erred by (1) not communicating with the Latvian orphan's court in a timely manner; (2) denying her motion for an enlargement of time to accept her testamentary appointment of guardianship; (3) admitting and failing to consider certain testimony; (4) violating her due process rights; (5) violating the Hague Convention on the Civil Aspects of International Child Abduction (hereinafter, the Hague Convention); and (6) allowing her unknowing consent to a magistrate. We address and reject these contentions in turn. Finally, we decline to address several arguments that Ms. Dusalijeva raises for the first time in her reply brief.
A. Subject Matter Jurisdiction
¶ 12 Ms. Dusalijeva contends that the probate court lacked subject matter jurisdiction under sections 15-14-204(5), 14-13-204(1), 14-13-204(2), and 14-13-201(1), C.R.S. 2016.
*180 1. Preservation and Standard of Review
¶ 13 Generally, a party may contest subject matter jurisdiction at any time; it cannot be waived or conferred by consent, estoppel, or laches. See, e.g. , People v. McMurtry , 122 P.3d 237, 240 (Colo. 2005) ; Mesa Cty. Valley Sch. Dist. No. 51 v. Kelsey , 8 P.3d 1200, 1206 (Colo. 2000) ; People in Interest of S.T. , 2015 COA 147, ¶ 37, 361 P.3d 1154.
¶ 14 The question whether a trial court has jurisdiction over a child custody proceeding presents a question of law that we review de novo. Brandt v. Brandt , 2012 CO 3, ¶ 18, 268 P.3d 406 ; In re L.S. , 257 P.3d 201, 204 (Colo. 2011).
2. Analysis
a. Temporary Jurisdiction Under Sections 15-14-204(5) and 14-13-204(1)
i. Section 15-14-204(5)
¶ 15 Ms. Dusalijeva contends the probate court lacked jurisdiction on the three occasions it temporarily appointed her and Ms. Blumberg as co-guardians. We disagree.[1]
¶ 16 Sections 15-14-201 to - 210, C.R.S. 2016, of the Colorado Probate Code govern the appointment of guardians for minors. A guardian may be appointed by a parent under section 15-14-202, C.R.S. 2016 (a "testamentary appointment"), or by a court under section 15-14-204 (a "judicial appointment"). This case concerns a judicial appointment. Section 15-14-204(5) provides, in relevant part, as follows:
If the court finds that following the procedures of this part 2 will likely result in substantial harm to a minor's health or safety and that no other person appears to have authority to act in the circumstances, the court, on appropriate petition, may appoint an emergency guardian for the minor.
(1) March 12, 2015
¶ 17 In March, May, and July 2015, the court found (1) that following the procedures of part 2 was likely to result in substantial harm to L.B.'s health or safety and (2) that no other person appeared to have authority to act for L.B. Ms. Dusalijeva argues that there was no evidence supporting either requirement.
¶ 18 It is questionable whether Ms. Dusalijeva's arguments actually implicate the court's jurisdiction. The Colorado Constitution and Colorado statutes confer subject matter jurisdiction on the Denver Probate Court for matters regarding guardianship of minors. Colo. Const. art. VI, § 9 (3) (conferring "exclusive original jurisdiction" over "appointment of guardians" to the Denver Probate Court); § 13-9-103(1), C.R.S. 2016 (Denver Probate Court "has original and exclusive jurisdiction" over "[t]he granting of letters ... of guardianship" and "[t]he administration of guardianships of minors"); § 15-10-302(2), C.R.S. 2016 (Denver Probate Court "has full power to make orders, judgments, and decrees and take all other action necessary and proper to administer justice in the matters which come before it"). And section 15-14-204(5) does not phrase the requirements for appointment of an emergency guardian in jurisdictional terms.[2] But whether framed as an attack on the court's subject matter jurisdiction or a mere challenge to the sufficiency of the evidence, Ms. Dusalijeva's argument fails.
¶ 19 During the March hearing, Ms. Blumberg said, "I just need to make sure that [Ms. Dusalijeva] has, you know, some rights while [L.B.] is, you know, in her possession so that she can care for [L.B.] in case of emergency or anything else." The court agreed: "And that's exactly what an emergency guardianship is." The court then determined, "If we were to follow the procedures *181 for notice, the minor would not have anybody to be able to make decisions and [she] would be at risk." For example, absent appointment of a legal guardian, no one would be able to authorize the mental health treatment for L.B. that the court recognized she needed. Therefore, the court reasonably concluded that failing to appoint a temporary guardian for L.B. would result in substantial harm to her health.
¶ 20 As for the court's finding that there was no other person with authority to act for L.B., Ms. Dusalijeva's sworn statements alone provided the court with a sufficient evidentiary basis. She stated under oath that "there is no one with legal authority to care for [L.B.]" and "[t]here is no person currently acting as Guardian or Conservator to [L.B.] in Colorado or elsewhere." Cf. People in Interest of N.D.V. , 224 P.3d 410, 414 (Colo. App. 2009) (when mother admitted fact of child being neglected or dependent, and, under section 19-1-104(1)(b), C.R.S. 2016, a juvenile court's subject matter jurisdiction in dependency or neglect cases is based on the fact of the child being dependent or neglected, the court's acceptance of her admission established the essential factual predicate for the court's exercise of its jurisdiction).
¶ 21 Ms. Dusalijeva's subsequent assertion, which she repeats on appeal, that she "had guardianship over L.B., per Colorado and Latvian law," was arguably waived by her prior sworn admissions to the contrary. But even if it was not waived, it fails. Though Ms. Dusalijeva is correct that a testamentary appointment is generally effective upon the death of the appointing parent, the person designated must timely petition the court to confirm the appointment. § 15-14-202(4) ; In re R.M.S. , 128 P.3d 783, 785 (Colo. 2006). As discussed below, not only did Ms. Dusalijeva not accept her appointment within the thirty-day time period required by the statute, she expressly relinquished that priority before the court. Further, and as discussed more fully below, the record does not show a valid prior appointment under Latvian law.
¶ 22 In sum, the court had jurisdiction under section 15-14-204(5) on March 12, 2015.
(2) May 6, 2015
¶ 23 When Ms. Dusalijeva and Ms. Blumberg petitioned the probate court for an extension of the temporary appointment pursuant to section 15-14-204(4) on May 4, 2015, nothing in their petition indicated that any facts on which the probate court had based its March appointment had changed. The co-guardians said only that an extension was necessary to prevent a lapse in legal authority over L.B. Thus, the probate court continued to have jurisdiction under section 15-14-204(5) on May 6, 2015.
(3) July 8, 2015
¶ 24 By the July hearing, Ms. Dusalijeva had filed a motion under C.R.C.P. 60(b) to vacate the probate court's prior orders, and Ms. Blumberg had filed a petition for a temporary appointment of her alone as L.B.'s guardian. Though the co-guardians presented different positions at that time, neither party asserted that L.B.'s situation had changed in a way that negated the probate court's prior findings regarding her need for a temporary guardian.
¶ 25 Although Ms. Dusalijeva argues that she possessed authority pursuant to the 2014 Will, she did not. Nor did she possess authority over L.B. under Latvian law. Contrary to Ms. Dusalijeva's assertion in July 2015, the April 23, 2015, letter from the Latvia orphan's court was not intended to indicate that an order from that court appointing her as L.B.'s guardian had been entered, as that court subsequently made perfectly clear in a letter dated November 23, 2015. The Latvian appellate court later found that Ms. Dusalijeva and her Latvian attorney had attempted to deceive the Latvian orphan's court by relying on the superseded 2012 Will and failing to inform the court of the 2014 Will and the Colorado proceedings. The Latvian appellate court affirmed the orphan's court's termination of the guardianship case based on the conclusion that matters regarding L.B. should be determined by a court in the United States.
¶ 26 For these reasons, the court continued to have jurisdiction under section 15-14-204(5) on July 8, 2015.
*182 ii. Section 14-13-204(1)
¶ 27 Ms. Dusalijeva also contends that the probate court lacked subject matter jurisdiction pursuant to section 14-13-204(1) on each of the three occasions it granted temporary co-guardianship.
¶ 28 The Uniform Child-custody Jurisdiction and Enforcement Act (the Act) governs whether a court has jurisdiction with respect to matters relating to the care and control of a child, including allocation of parental responsibilities. §§ 14-13-101 to - 403, C.R.S. 2016. Section 14-13-204(1) provides that
[a] court of this state has temporary emergency jurisdiction if the child is present in this state and the child has been abandoned or it is necessary in an emergency to protect the child because the child, or a sibling or parent of the child, is subjected to or threatened with mistreatment or abuse.
¶ 29 As the probate court noted in its order denying Ms. Dusalijeva's C.R.C.P. 60(b) motion to vacate all orders for lack of subject matter jurisdiction, Ms. Dusalijeva failed to argue a lack of jurisdiction under the Act during the proceedings, and instead affirmatively sought temporary co-guardianship and permanent appointment pursuant to the Colorado Probate Code. Thus, the lack of findings regarding the statutory requirements of the Act was merely a result of Ms. Dusalijeva's failure to timely raise the issue. Nonetheless, the probate court found that it had jurisdiction under the Act because L.B. had been "abandoned" within the meaning of section 14-13-204(1). We agree with that finding.[3]
¶ 30 The Act defines "abandoned" as being "left without provision for reasonable and necessary care or supervision." § 14-13-102(1), C.R.S. 2016. As she did in the probate court, Ms. Dusalijeva argues that L.B. was never abandoned because there was a testamentary appointment and because L.B. was never left without provision for reasonable and necessary care and supervision.
¶ 31 As noted above, however, before the March hearing, Ms. Dusalijeva provided a sworn statement saying that "there was no one with legal authority to care for [L.B.]." And in her May petition for an extension of the co-guardianship, Ms. Dusalijeva did not allege a change in circumstances regarding L.B., and she told the probate court that the extension was necessary to "prevent a lapse in the legal authority over [L.B.]."
¶ 32 By the July hearing, as discussed below, Ms. Dusalijeva had waived her testamentary appointment. Consequently, if the court had not extended the temporary guardianship, there would have been a lapse in authority to care for L.B. before the August hearing. The probate court also observed that while Ms. Dusalijeva had provided for L.B.'s physical care and supervision (pursuant to the court's appointment), she had provided all other forms of care using only funds from Mr. Berzins or his estate. Ms. Dusalijeva did not show that she had the resources to provide that care.
¶ 33 Thus, we conclude that the probate court had jurisdiction under section 14-13-204(1).
b. Permanent Jurisdiction Under Section 14-13-204(2)
¶ 34 Ms. Dusalijeva also contends that the probate court lacked subject matter jurisdiction pursuant to section 14-13-204(2). That section provides that "a child-custody determination made under [ section 14-13-204(1) ] becomes a final determination, if it so provides and this state becomes the home state of the child." Subsection (2) is arguably inapplicable in this case because the court did not say that its temporary orders appointing co-guardians would become permanent. Instead, the court held a hearing in August 2015 to determine independently who should be L.B.'s permanent guardian. But we need not decide this issue because jurisdiction for the court's determination of permanent guardianship existed under section 14-13-201, which we discuss below.
*183 c. Permanent Jurisdiction Under Section 14-13-201(1)
¶ 35 Ms. Dusalijeva appears to contend that the probate court also lacked subject matter jurisdiction to determine permanent guardianship under section 14-13-201(1). We disagree.
¶ 36 Section 14-13-201(1) provides four separate bases for a court's subject matter jurisdiction to make a child custody determination. Subsection (a) provides for jurisdiction in the child's home state "on the date of the commencement of the proceeding." Subsection (b) provides an alternative basis for jurisdiction that may be invoked either when there is no home state or when the child and her family have equal or stronger ties with a state other than the home state. See Unif. Child Custody Jurisdiction Act § 3 commissioner's note, 9 U.L.A. 123 (1968).[4] Subsections (c) and (d) provide bases for jurisdiction to be resorted to only if no other state can or will assume jurisdiction under the other subsections of section 14-13-201(1).
¶ 37 The probate court properly exercised subject matter jurisdiction pursuant to subsection (a), and pursuant to at least one of subsections (b), (c), or (d).[5]
¶ 38 Beginning with subsection (a)-the "home state" provision- section 14-13-102 defines home state as "the state in which a child lived with a parent or a person acting as a parent for at least one hundred eighty-two consecutive days immediately before the commencement of a child-custody proceeding." It is undisputed that because L.B. arrived in Colorado on January 1 or 2, 2015, and remained here, Colorado became her home state at the latest on July 2, 2015. Ms. Dusalijeva appears to contend, however, that "the proceeding" within the meaning of subsection (a) began in March 2015. Under that interpretation, Colorado would not have been L.B.'s home state.
¶ 39 In Barden v. Blau , 712 P.2d 481 (Colo. 1986), the supreme court held that "the proceeding" in the context of this statute means "the pending motion affecting custody or visitation." Id. at 485. In so holding, it drew on decisions by the "overwhelming number of courts" in other jurisdictions interpreting the Act. Id. ; see, e.g. , L.F. v. G.W.F. , 183 N.J.Super. 195, 443 A.2d 751, 754-55 (1982) (holding that the home state of the child was to be determined at the time of father's application to modify a visitation order because that was the "immediate application" being considered by the court); see also Campbell v. Alpers , 110 N.M. 21, 791 P.2d 472, 475 (Ct. App. 1990) (holding "proceeding" refers to the most recent proceeding concerning child custody, not the initial proceeding); Zellat v. Zellat, 351 Pa.Super. 623, 506 A.2d 946, 949 (1986) (construing "the proceeding" as referring to the proceeding in which jurisdiction is first sought under the statute).
¶ 40 Thus, "the proceeding" for purposes of subsection (a) was the motion prompting the August 2015 hearing, at which the issue of permanent guardianship was adjudicated.
¶ 41 The next issue is when the proceeding "commenced." Section 14-13-102(5) defines commencement as "the filing of the first pleading in a proceeding."
¶ 42 On July 19, 2015, Ms. Dusalijeva filed a motion to terminate all proceedings and vacate all orders issued by the probate court concerning the guardianship of L.B. This pleading sought an order allowing Ms. Dusalijeva to "exercise her rights as sole legal guardian of [L.B.]," though it also sought termination of the court's orders pursuant to the Hague Convention. Consequently, this pleading may have commenced the proceeding pursuant to section 14-13-201. (And if it did, it did so after Colorado had become L.B.'s home state.)
¶ 43 At the July 8, 2015, hearing, the court said that a hearing was necessary to determine permanent custody of L.B. By that point, Colorado had become L.B.'s home state. On July 27, 2015, Ms. Dusalijeva filed a petition for appointment of herself as L.B.'s permanent guardian. This was the first *184 pleading in the proceeding. Because this occurred after July 2, 2015, the probate court had subject matter jurisdiction in August when it ruled regarding L.B.'s permanent guardian.
¶ 44 Subsection (b) provides that a Colorado court has jurisdiction if (1) "[a] court of another state does not have jurisdiction under a provision of law adopted by that state that is in substantial conformity with [subsection] (a)" or (2) "a court of the home state of the child has declined to exercise jurisdiction on the ground that [Colorado] is the more appropriate forum under a provision of law adopted by that state that is in substantial conformity with section 14-13-207 or 14-13-208...."[6] Ms. Dusalijeva never demonstrated that Latvia-the only other "state" alleged to have jurisdiction-has adopted a provision in substantial conformity with section 14-13-201(1)(a). And even if Latvia had, the Latvian courts declined to exercise jurisdiction, ruling that Colorado was a more appropriate forum.
¶ 45 Further, if Latvia had adopted such a provision, the district court had jurisdiction under subsection (c)-which applies when all courts having jurisdiction pursuant to provisions in substantial conformity with subsections (a) and (b) have declined to exercise jurisdiction because Colorado is a more appropriate forum. As noted, Latvia declined jurisdiction. And if Latvia had not adopted such a provision, the district court had jurisdiction under subsection (d)-which applies when no court of any other state would have jurisdiction under a provision of law in substantial conformity with subsections (a) through (c). Again, as noted, there was no showing that Latvia had jurisdiction under any provision of law in substantial conformity with subsections (a) through (c).
B. Communication With the Latvian Orphan's Court
¶ 46 Ms. Dusalijeva also contends that the probate court failed to communicate with the orphan's court as required by the Act. Section 14-13-206(a) provides, in relevant part, as follows:
[A] court of this state, before hearing a child-custody proceeding, shall examine the court documents and other information supplied by the parties pursuant to section 14-13-209. If the court determines that a child-custody proceeding has been commenced in a court in another state having jurisdiction substantially in accordance with a provision of law adopted by that state that is in substantial conformity with this article, the court of this state shall stay its proceeding and communicate with the court of the other state.
¶ 47 Ms. Dusalijeva did not raise this issue until she filed her C.R.C.P. 60(b) motion. The issue is not jurisdictional, and we are at a loss to see how the court's alleged failure constitutes a basis for relief under C.R.C.P. 60(b).
¶ 48 In any event, this argument lacks merit. Ms. Dusalijeva made no showing that Latvia had adopted law in substantial conformity with the Act. See § 14-13-206(1). She attempts to do so for the first time in her reply brief on appeal. We do not consider arguments raised for the first time in a reply brief. Battle N., LLC v. Sensible Hous. Co. , 2015 COA 83, ¶ 41, 370 P.3d 238 ; IBC Denver II, LLC v. City of Wheat Ridge , 183 P.3d 714, 718 (Colo. App. 2008).
¶ 49 Further, any error was harmless. Once the probate court communicated with the Latvian orphan's court in February 2016, informing it of the 2014 Will and the history of the proceedings before it, the orphan's court terminated its own proceedings. The Latvian appellate court affirmed. Thus, nothing in the record indicates that the result would have been different had the communication occurred earlier.
C. Motion for Enlargement of Time to Accept Testamentary Guardianship
¶ 50 Ms. Dusalijeva contends that the probate court erred by declining to give her guardianship priority as required by Mr. Berzins' 2014 Will. We perceive the issue as whether the probate court abused its discretion by denying her motion for an enlargement *185 of time to accept the testamentary guardianship.[7]
1. Preservation and Standard of Review
¶ 51 We agree with appellees that Ms. Dusalijeva waived this issue for appeal. A waiver occurs when a party removes an issue from the court's consideration. See, e.g. , People in Interest of T.B. , 2016 COA 151, ¶ 58; Harper Hofer & Assocs., LLC v. Nw. Direct Mktg., Inc. , 2014 COA 153, ¶¶ 11-16, 320 P.3d 406; People in Interest of T.E.R ., 2013 COA 73, ¶ 26, 305 P.3d 414.
¶ 52 At the May hearing, the magistrate inquired whether Ms. Dusalijeva was aware that she had been appointed under Mr. Berzins' 2014 Will as the guardian for L.B., and therefore had priority under Colorado law. Ms. Dusalijeva answered affirmatively and said that, regardless of that priority, she was "absolutely" agreeing to co-guardianship with Ms. Blumberg. She thereby waived any right to assert her priority.
¶ 53 Alternatively, were we to address the issue, we would review the court's decision for an abuse of discretion. Jefferson Cty. Bd. of Equalization v. Gerganoff , 241 P.3d 932, 937 (Colo. 2010) ("As a general matter, 'may' denotes a grant of discretion."). A court abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair, or is based on application of an erroneous legal standard. Core-Mark Midcontinent Inc. v. Sonitrol Corp. , 2016 COA 22, ¶ 49, 370 P.3d 353. We conclude that the court did not abuse its discretion.
2. Analysis
¶ 54 Although a parent may make a testamentary appointment, "[t]he guardian becomes eligible to act upon the filing of an acceptance of appointment, which must be filed within thirty days after the guardian's appointment becomes effective." § 15-14-202(4). The appointment becomes effective upon the death of the appointing parent. § 15-14-202(3). But if the appointee fails to accept the appointment within thirty days, "the court may proceed with another appointment." § 15-14-204(3).
¶ 55 Nothing in the statute requires a court to provide any period beyond the thirty days for a testamentary appointee to accept the appointment. Indeed, in her motion for enlargement of time and her opening brief on appeal, Ms. Dusalijeva acknowledges that the probate court had discretion not to do so. She does not really explain, however, why the court abused its discretion. Given that she expressly disclaimed the priority appointment and proceeded with co-guardianship for several months, we perceive no abuse of discretion.
¶ 56 Ms. Dusalijeva rather vaguely asserts that she received ineffective assistance of counsel. But she has no constitutional or statutory right to counsel in this case. Additionally, when Ms. Dusalijeva and Ms. Blumberg were jointly represented, there was no indication that their interests were adverse. See Colo. RPC 1.7(a). They represented to the court, more than once, that they shared the same goal-co-guardianship of L.B. When Ms. Dusalijeva apparently changed her mind, counsel withdrew as her counsel. To the extent Ms. Dusalijeva asserts she was intimidated into seeking the joint guardianship, the record is devoid of any evidence supporting that assertion. Casias v. People , 160 Colo. 152, 162, 415 P.2d 344, 349 (1966) ("It is fundamental that this court-or any court-does not settle legal questions on the naked factual assertions of counsel.").
¶ 57 Ms. Dusalijeva also argues that the probate court should have appointed her as L.B.'s guardian because nobody (or, at least, nobody with standing) objected to the appointment pursuant to section 15-14-203(1), C.R.S. 2016. But the statute is clear-"[t]he authority of a guardian appointed under this section terminates upon ... the appointment of a guardian by the court." § 15-14-202(9). Thus, once the probate court granted Ms. Dusalijeva's petition for co-guardianship with Ms. Blumberg, any authority she could have had as the testamentary guardian was terminated. Therefore, it is immaterial whether *186 anyone objected to her testamentary appointment (or whether Ms. Blumberg had standing to object).
D. Evidentiary Rulings
1. Standard of Review
¶ 58 We review a trial court's evidentiary rulings for an abuse of discretion. E-470 Pub. Highway Auth. v. 455 Co. , 3 P.3d 18, 23 (Colo. 2000). A court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair. Id. A court's erroneous evidentiary ruling is reversible only if a substantial right of a party is affected; that is, if the error substantially influenced the outcome of the case. Genova v. Longs Peak Emergency Physicians, P.C. , 72 P.3d 454, 459 (Colo. App. 2003).
2. Analysis
a. Testimony Regarding the Latvian Educational System
¶ 59 Ms. Dusalijeva contends that the probate court abused its discretion by allowing testimony by lay people regarding the quality of the Latvian educational system. We agree with appellees that Ms. Dusalijeva preserved this argument only as to some of the testimony by the guardian ad litem and Ms. Blumberg. She did not object to testimony from others that Mr. Berzins believed that L.B. would receive a better education in the United States. We are not persuaded that any error that occurred requires reversal.
¶ 60 CRE 701 prohibits lay testimony "based on scientific, technical, or other specialized knowledge within the scope of Rule 702," but it allows opinions that are "rationally based on the perceptions of the witness." Under CRE 701, "the critical inquiry is whether a witness's testimony is based upon 'specialized knowledge.' " People v. Rincon , 140 P.3d 976, 982 (Colo. App. 2005).
¶ 61 Ms. Blumberg and three other witnesses testified that Mr. Berzins told them he believed L.B. would receive a better education in the United States. This unobjected-to testimony was sufficient to support the probate court's finding, and thus any error in allowing the objected-to testimony was harmless.
b. Consideration of Psychiatrist's Report
¶ 62 Ms. Dusalijeva submitted a child psychiatrist's report to support her position that it would be detrimental for L.B. to be removed from her care. She argues that the probate court abused its discretion because it determined that the psychiatrist's report was not probative, and because it found the report unpersuasive based on expert testimony in other cases.
¶ 63 Before reading the psychiatrist's report, the court "wonder[ed] what the real value" of it would be, given that it was based on an hour-and-a-half interaction with L.B. But the court considered the report and ultimately found it to be unpersuasive "when viewed against testimony from individuals who have heard and interacted with [L.B.], Mr. Berzins and Ms. Dusalijeva." It is the trial court's province to weigh the evidence before it, Morris v. Askeland Enters.,Inc. , 17 P.3d 830, 832 (Colo. App. 2000), and we perceive no abuse of discretion in this instance.
¶ 64 As Ms. Dusalijeva points out, the probate court also reasoned that the psychiatrist's observations "appear[ ] to conflict with other expert testimony received by the Court on other, similar cases." That arguably constituted an improper application of judicial notice. But any such error was harmless. The court noted: "The observations as reflected in the statement support testimony the Court has received to the effect that [L.B.] considers Ms. Dusalijeva as her mother." And, as discussed, the court acted within its discretion in giving more weight to the testimony of other witnesses.
E. Due Process
¶ 65 Ms. Dusalijeva argues that the probate court's denial of her motion to waive the requirement of a credit report violated her right to due process. But she did not make that argument in the probate court. Therefore, we will not address it. See Estate of Stevenson v. Hollywood Bar & Cafe, Inc. , 832 P.2d 718, 721 n.5 (Colo. 1992) ;
*187 Estate of Sandstead v. Corona , 2016 COA 49, ¶ 71 n.22, 412 P.3d 799 (cert. granted sub nom. Sandstead-Corona v. Sandstead , Nov. 21, 2016).[8]
F. Hague Convention
¶ 66 Ms. Dusalijeva also contends the probate court violated the Hague Convention. We disagree.
¶ 67 The purpose of the Hague Convention, Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89, is to promptly return children who are wrongfully removed or retained, unless one of the express, narrow exceptions applies. Navani v. Shahani , 496 F.3d 1121, 1124 (10th Cir. 2007) ("[The Hague Convention] seeks to deter parents who are dissatisfied with current custodial arrangements from abducting their children and seeking a more favorable custodial ruling in another country.").
¶ 68 Under the Convention, a removal is wrongful where (1) it is in breach of rights of custody attributed to a person under the law of the child's state of habitual residence and (2) at the time of the retention those rights were being exercised. Hague Convention art. 3. "Rights of custody" are "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Id. art. 5, ¶ a.
¶ 69 We will not disturb the probate court's findings that L.B. was a habitual resident of Colorado at the time of Mr. Berzins' death. And in any event, because Ms. Dusalijeva is not an adoptive or natural parent, she had no custody rights to L.B. and no right to determine her place of residence. The Latvian orphan's court made clear in its November 23, 2015, letter that there had not been an order appointing her as guardian in Latvia. No order of another court had otherwise given her a right of custody, and, as discussed above, she waived her testamentary appointment.
¶ 70 Thus, the probate court did not violate the Hague Convention.
G. Consent to a Magistrate
¶ 71 Lastly, Ms. Dusalijeva vaguely contends that she never consented to a magistrate. This contention fails for several reasons.
¶ 72 First, Ms. Dusalijeva makes this argument for the first time on appeal, and, thus, it is not preserved. Estate of Stevenson , 832 P.2d at 721 n.5.
¶ 73 Second, Ms. Dusalijeva is bound by the actions of her attorney, who clearly consented to the magistrate. Mountain States Tel. & Tel. Co. v. Dep't of Labor & Emp't , 184 Colo. 334, 338, 520 P.2d 586, 589 (1974) ; Brodeur v. Indus. Claim Appeals Office , 159 P.3d 810, 813 (Colo. App. 2007).
¶ 74 Third, as explained above, Ms. Dusalijeva and Ms. Blumberg were not adverse parties while they were jointly represented.
H. New Arguments in Reply Brief
¶ 75 Following briefing, appellees filed a motion to strike new arguments contained in Ms. Dusalijeva's reply brief. It is well settled that we will not consider arguments raised for the first time in a reply brief. E.g. , People v. Czemerynski , 786 P.2d 1100, 1107 (Colo. 1990) ; Saint John's Church in the Wilderness v. Scott , 2012 COA 72, ¶ 9 n.3, 296 P.3d 273. Therefore, we do not consider the following:
• the argument that the probate court improperly imputed Latvian counsel's wrongdoing to Ms. Dusalijeva;
• the argument that the probate court improperly considered evidence regarding Ms. Dusalijeva's potential control over the estate's assets;
• the argument that the probate court failed to consider whether an "inheritance guardian" would have been established if a Latvian court appointed Ms. *188 Dusalijeva guardian under the 2014 Will; and
• evidence that Latvian law is in substantial conformity with the Act.
III. Conclusion
¶ 76 The orders are affirmed.
JUDGE GRAHAM and JUDGE MILLER concur.

Though we conclude that temporary jurisdiction existed, this issue may be moot given that we also conclude that the probate court had subject matter jurisdiction to appoint a permanent guardian for L.B., and that it did not err in doing so. See Am. Drug Store, Inc. v. City & Cty. of Denver , 831 P.2d 465, 469 (Colo. 1992) (an issue is moot when the relief sought, if granted, would have no practical effect on an existing controversy).

Section 14-13-204, C.R.S. 2016, on the other hand, speaks in terms of the court's emergency jurisdiction over children. We address that section below.

Because the probate court properly exercised jurisdiction in appointing temporary co-guardians pursuant to section 15-14-204(5), C.R.S. 2016, a finding of jurisdiction pursuant to section 14-13-204(1) may be unnecessary. We need not decide that question.

Section 14-13-201, C.R.S. 2016, generally continues the provisions of former Uniform Child Custody Jurisdiction Act section 3.

Subsections (a) through (d) are phrased in the disjunctive; thus, jurisdiction may be based on a single subsection.

For purposes of the Act, Latvia is a state. § 14-13-104(1), C.R.S. 2016.

We do so because Ms. Dusalijeva cites no authority for the proposition that the court was obligated to sua sponte accord her priority. Any such contention would be contrary to the express language of the statute, which requires a particular manner of acceptance by the designee.

Ms. Dusalijeva has not identified any protected liberty or property interest that was denied by the probate court's ruling. See, e.g. , M.S. v. People , 2013 CO 35, ¶ 10, 303 P.3d 102 ("If there is no denial of a liberty or property interest, then the government does not have to provide procedural due process."). She also cites no authority that required the probate court to excuse her from the obligation to provide a credit report.